# EXHIBIT "H"

**FERMIN VINCENT VALENZUELA vs CITY OF ANAHEIM, ET AL.**
Aruna Singhania, M.D. on 11/28/2018

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

 3

 4   FERMIN VINCENT VALENZUELA,    )
                                   )
 5                  Plaintiff,     )
                                   )
 6   vs.                           )  SACV17-0278 CJC (DFMx)
                                   )
 7   CITY OF ANAHEIM, et al.,      )
                                   )
 8                  Defendants.    )
                                   )
 9                                 )
     AND ALL RELATED CROSS-ACTIONS.)
10   _____)

11

12

13            DEPOSITION OF ARUNA SINGHANIA, M.D.

14               Wednesday, November 28, 2018

15                  1:12 p.m. - 3:29 p.m.

16

17

18

19

20

21

22   REPORTED BY JACQUELINE A. MONTANA, CSR NO. 11023

23

24

25
```

```
 1     A     I have no idea.
 2     Q     Do you know from what portion of
 3  Mr. Valenzuela's body the blood was taken?
 4     A     No.
 5     Q     Do you know the manner in which the blood was
 6  preserved prior to it being tested?
 7     A     Again I don't have any detail of that.
 8     Q     Do you know how long -- oh, strike that.
 9           Did you do anything to verify the findings in
10  this report?
11     A     I mean -- they are the toxicologists.  They
12  are -- how I can verify somebody else report?
13     Q     That's what I'm asking, if you did anything at
14  all?
15     A     No, I did nothing.
16     Q     So you just obtained this report, and you
17  included it within your report?
18     A     That's correct.
19     Q     Okay.  The report -- and we're still on
20  page 14 -- that suggests that Mr. Valenzuela had
21  methamphetamine and amphetamine in his system at the
22  time of the testing; correct?
23     A     That's right.
24     Q     The amounts of amphetamine and methamphetamine
25  in his system, are you qualified to give an opinion as
```

```
 1           MS. WILLIAMS:  -- misstates her testimony.
 2   BY MR. MARKS:
 3      Q    As opposed to you're giving me a medical
 4   opinion?
 5      A    That's -- that's right.
 6      Q    You're giving me your commonsense opinion?
 7      A    Right.
 8      Q    So you cannot say with reasonable medical
 9   probability that the methamphetamine or the amphetamine
10   affected his behavior; correct?
11      A    Again if he -- not -- then he should not be
12   dying or anything.
13      Q    Sorry, "he should not"?
14      A    He should not be -- be having all the problem
15   which he has it.
16      Q    If you turn to page 16, please --
17      A    16.
18      Q    -- is there anything on page 16 that factored
19   into your opinions of Mr. Valenzuela's cause of death?
20      A    No.
21      Q    Page 16 was the last page in -- in the exhibit;
22   correct?
23      A    Correct.
24      Q    Your opinion as to the cause of death was
25   "Complications of asphyxia during struggle with law
```

```
 1   enforcement officers while under the influence of
 2   methamphetamine"?
 3       A    Right.
 4       Q    Correct?
 5       A    Yeah.
 6       Q    I've read this a lot of times, and I'm a little
 7   confused by it.  And -- and I want you to explain the
 8   part where you added "while under the influence of
 9   methamphetamine."  And I am going to break down my
10   question, kind of ask you twice --
11       A    Okay.
12       Q    -- all at once.
13            Is it your opinion that the cause of
14   Mr. Valenzuela's death was complications of asphyxia
15   during a struggle with law enforcement officers, and he
16   just happened to be under the influence of
17   methamphetamine at the time?
18            MS. WILLIAMS:  Vague and ambiguous --
19   BY MR. MARKS:
20       Q    Do you understand --
21            MS. WILLIAMS:  -- compound.
22   BY MR. MARKS:
23       Q    -- what I'm asking you?
24       A    I cannot separate them.
25       Q    Okay.  The -- the phrase "while under the
```

```
 1    A    Right.
 2    Q    It's not a lethal level?
 3    A    That's correct.
 4         MR. MARKS:  Objection, asked and answered,
 5    argumentative.
 6    BY MS. WILLIAMS:
 7    Q    When you were testifying about possible causes
 8    of a hyoid fracture you identified various things,
 9    including traffic accidents, surgical interventions, and
10    placement of an endotracheal tube; right?
11    A    Right.
12    Q    To your knowledge, did Mr. Valenzuela have an
13    endotracheal tube placed in his throat?
14    A    Yeah.  It was there.
15    Q    Do you know one way or another whether the
16    placement of that endotracheal tube caused the fracture
17    to Mr. Valenzuela's hyoid bone?
18         MR. MARKS:  Lacks foundation, calls for
19    speculation.
20         THE WITNESS:  Because endotracheal tube, when
21    you have wrong placement.  This was not a wrong
22    placement; so it did not cause -- the cause of
23    endotracheal tube.
24    BY MS. WILLIAMS:
25    Q    And I'm sorry, I know you testified earlier
```

```
 1  when you saw the videos that showed Mr. Valenzuela's
 2  interaction with the police.
 3          But could you remind me of when that was?
 4     A    Again I don't remember -- I definitely see
 5  probably after the autopsy.
 6     Q    Do you recall how long after the autopsy it was
 7  that you saw the videos?
 8     A    No, I don't.
 9     Q    Who -- and who was present with you when you
10  saw the videos?
11     A    The -- the DA from the district attorney
12  office, they bring the video and they showed it to me.
13     Q    Were there other medical examiners from the
14  coroner's department present watching those videos with
15  you?
16     A    I don't recall it.
17     Q    Before you saw the videos of Mr. Valenzuela's
18  interaction with the police officers did you have any
19  opinion one way or another about what had caused the
20  hyoid bone fracture?
21     A    Only thing I can -- right away I figure out
22  there's some kind of struggle went through and that
23  caused the hemorrhage here.
24     Q    So based on the information only that you had
25  been told about what transpired between Mr. Valenzuela
```

1  and the police, you assumed that the hyoid bone had been
2  fractured during that struggle?
3      A    Right.
4      Q    And it's your testimony that when you watched
5  the videos showing Mr. Valenzuela's interaction with the
6  police officers that confirmed your assumption?
7      A    That's correct.
8      Q    At one point in time did you believe that the
9  cause of death of Mr. Valenzuela was natural -- or the
10 manner of death was natural?  I'm sorry.
11     A    I never thought it natural, but he had -- as I
12 said, he has enlarged heart.  When I did the autopsy the
13 only thing which I see hemorrhage in the hyoid and a
14 fracture of the hyoid and then enlarged heart.
15     Q    And so when you did the autopsy and you saw the
16 enlarged heart and the fracture of the hyoid your
17 initial impression was that the manner of death was
18 natural?
19          MR. MARKS:  Objection, argumentative, misstates
20 testimony, asked and answered.
21          THE WITNESS:  See, the main thing is at that
22 time only speculation because there's nothing else.
23 I -- I don't have drug analysis.  I don't have any other
24 thing.  So he has enlarged heart, and he has -- so I
25 have to put the case together.  I cannot put the case

FERMIN VINCENT VALENZUELA vs CITY OF ANAHEIM, ET AL.
Aruna Singhania, M.D. on 11/28/2018                                Page 80

```
 1   together.  So just looking at enlarged heart I always
 2   say he has something natural in his body.
 3   BY MS. WILLIAMS:
 4       Q    So you talked earlier about the fact that the
 5   amendment to your report is dated April 17th, 2017.
 6            Is it common for you to wait almost nine months
 7   from the time of doing an autopsy until the time of, I
 8   guess, finalizing your report?
 9            MR. MARKS:  Objection, incomplete hypothetical,
10   argumentative --
11            THE WITNESS:  It usually --
12            MR. MARKS:  -- assumes facts not in evidence.
13            THE WITNESS:  It usually takes time.
14   BY MS. WILLIAMS:
15       Q    And what was the amendment that you made to
16   your report on April 17, 2017?
17       A    Again it was a pending.  First was the pending
18   cause of death.  It was not even finalized.  So the
19   amendment was the finalized cause of death.
20       Q    So it took you nine months to determine the
21   actual cause of Mr. Valenzuela's death?
22       A    Yes.
23            MR. MARKS:  Objection, argumentative, asked and
24   answered.
25   ///
```

```
1   STATE OF CALIFORNIA    )
                           : Ss
2   COUNTY OF ORANGE       )

3

4            I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6            That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14           I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney or any of the parties.

17           IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:   December 10, 2018

21

22           [signature: Jacqueline A. Montana]

23           _____
             JACQUELINE A. MONTANA, CSR
24           Certificate No. 11023

25                                                        112
```