# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

|  |  |
|---|---|
| FERMIN VINCENT VALENZUELA, | Case No.: SACV 17-00278-CJC (DFMx), consolidated with SACV 17-02094-CJC (DFMx) |
| Plaintiff, | |
| v. | |
| CITY OF ANAHEIM, *et al*., | |
| Defendants. | **ORDER DENYING IN SUBSTANTIAL PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Dkt. 88]** |
| VINCENT VALENZUELA and XIMENA VALENZUELA by and through their guardian PATRICIA GONZALEZ, | |
| Plaintiffs, | |
| v. | |
| CITY OF ANAHEIM, *et al*., | |
| Defendants. | |

## I. INTRODUCTION

This civil rights action arises out of the tragic death of Fermin Vincent Valenzuela II ("Valenzuela") after an Anaheim Police Department officer placed him in a neck restraint in a 7-Eleven parking lot. Valenzuela's father, Fermin Vincent Valenzuela, and his two children ("Minor Plaintiffs") through their guardian, Patricia Gonzalez, brought separate actions against Defendants City of Anaheim, Anaheim Police Department ("APD"), Chief of Police Raul Quezada, Officer Daniel Wolfe, Officer Woojin Jun, and Sergeant Daniel Gonzalez. (Dkts. 1, 49 [Operative First Amended Complaint].)[1] The two cases have been consolidated for all purposes, including trial. (Dkt. 58.)

Plaintiffs bring claims under 42 U.S.C. § 1983 for deprivation of substantive due process, supervisory liability, excessive force, and unlawful custom, policy, and practice, and state law claims for wrongful death and violation of civil rights under California Civil Code §§ 51.7, 52.1. Before the Court is Defendants' motion for summary judgment. (Dkt. 88.) For the following reasons, the motion is **DENIED IN SUBSTANTIAL PART**.

## II. BACKGROUND

### A.   911 Call

On the morning of July 2, 2016, Valentina Moya was on a walk in Maxwell Park in Anaheim when she observed a man, later identified as Valenzuela, sitting beneath a palm tree. (Dkt. 99 at 92 [Pls.' Additional Uncontroverted Material Facts, hereinafter

---

[1] Valenzuela's father filed his action on February 15, 2017. Case No. 17-00278-CJC-DFM (C.D. Cal.). The action on behalf of Valenzuela's children was filed nine months later on November 29, 2017. Case No. 17-02094-CJC-DFM (C.D. Cal.). All citations to the docket are to the docket in Valenzuela's father's action, Case No. 17-00278-CJC-DFM.

"PAMF"] ¶ 114.)  As she continued her walk along a dirt path, she formed the impression that Valenzuela had started following her.  (Dkt. 99 [Pls.' Response to Defs.' Uncontroverted Material Facts, hereinafter "UMF"] ¶ 2.)  Although afraid, she continued her walk.  (PAMF ¶ 116.)

As Ms. Moya began walking home, she temporarily lost sight of Valenzuela.  (*Id.* ¶ 119.)  When she next saw him, he was walking on the opposite side of the street in the same direction as her.  (*Id.*)  At that point, Ms. Moya called her daughter, Enya Moya, and asked her to call the police because she believed that Valenzuela was following her.  (UMF ¶ 3.)  When Ms. Moya reached the sidewalk directly in front of her home, she stopped but did not go inside.  (*Id.* ¶ 4.)  Valenzuela then crossed the street and approached Ms. Moya, looking at her with what she described as a "really ugly" stare.  (*Id.*)  When Ms. Moya asked why he had followed her, he responded, "I'm homeless."  (*Id.* ¶ 5.)  Valenzuela then walked back across the street and Ms. Moya did not see him again.  (PAMF ¶ 123.)

Meanwhile, Ms. Moya's daughter, Enya, called APD.  She reported, "There's a man loitering around my home and, uh, he followed my mom home."  (*Id.* ¶ 6.)  She described Valenzuela as Hispanic, in his late-twenties, carrying a blue duffel bag, and wearing black pants, a black shirt, a tan beanie, and burgundy shoes.  (*Id.*)  APD dispatch made a radio broadcast to its officers regarding a "suspicious person" at the corner of Magnolia Avenue and West Broadway in Anaheim.  (*Id.* ¶ 7; PAMF ¶ 125.)  The broadcast included Enya's description.  (*Id.* ¶ 7.)  APD officers Jun and Wolfe responded to the call.  (*Id.* ¶ 8.)

//

### B.    Laundromat

When Jun and Wolfe arrived to Magnolia and Broadway, they observed a man meeting Enya's description "abruptly" turn and enter a laundromat.  (UMF ¶ 9.)  Video surveillance footage from the laundromat shows Valenzuela walking through the laundromat's front door at a normal pace.  (Dkt. 100 Ex. 8.)  The officers parked the patrol car in the laundromat parking lot and walked inside.  (SUF ¶ 10.)  Wolfe later reported that when he first saw Valenzuela, he thought, "If he was going to run, why didn't he run before?  He had plenty of time.  So I'm thinkin' this guy's going to fight us."  (Dkt. 104 [Defs.' Response to PAMF, hereinafter "DR"] ¶ 126.)

As both officers walked toward Valenzuela, they heard what they believed was a glass methamphetamine pipe breaking.  (UMF ¶ 11.)  At the time, Valenzuela's bag was on the floor in front of a washing machine, and he was placing clothing from the bag into the machine.  (*Id*. ¶ 13.)  Wolfe asked him: "Howdy, you alright?  You break a pipe or something?"  (*Id*. ¶ 12.)  Valenzuela seemingly did not respond.  (*See id*.)  Wolfe then observed the handle of a screwdriver in Valenzuela's bag.  (*Id*. ¶ 15.)

Wolfe testified that he became concerned Valenzuela might be armed because of the glass pipe he purportedly heard break and the screwdriver he observed.  (*Id*. ¶ 16.)  Wolfe asked Valenzuela to stop reaching into his bag and ordered him to put his hands behind his back.  (UMF ¶ 19.)  When Valenzuela did not comply, Wolfe grabbed his right arm and started to pull it behind his back.  (*Id*. ¶ 20.)  Jun meanwhile attempted to hold Valenzuela's arms in place from the front.  (*Id*. ¶ 23.)  Valenzuela then pulled away and the three of them fell to the floor of the laundromat.  (*Id*. ¶ 24.)

Still on the ground, Jun attempted to control Valenzuela using a neck restraint hold.  The parties dispute the type of hold that Jun used.  Jun testified that he applied the

carotid restraint hold, a technique where bilateral pressure is placed on a subject's carotid arteries on either side of the neck.  (*Id.* ¶¶ 25, 26, 30.)  The purpose of this hold is to restrict blood flow to the brain so that the subject temporarily loses consciousness.  (*Id.* ¶ 26.)  Plaintiffs, by contrast, assert that Jun applied an "air choke hold," a technique designed to obstruct the subject's airway and thereby prevent him from breathing.  (*Id.* ¶ 25.)

The footage from Wolfe's body-worn camera shows Jun had his right arm around Valenzuela's neck for at least twenty-two seconds.  (Dkt. 100 Ex. 9 at 1:28–1:50.)  Jun then alternated his right and left arm around Valenzuela's neck for another minute and twenty seconds.  (*Id.* at 1:53–2:18.)  Based on the video footage, Valenzuela seems to have difficulty breathing and his face appears to turn purple.  (*See id.*)  Jun, however, testified that he does not believe he ever cut off Valenzuela's airway.  (UMF ¶ 29.)  Wolfe, who closely observed Jun's conduct, could not identify the type of restraint hold Jun used because he could not tell whether Jun was applying pressure to Valenzuela's carotid arteries.  (*Id.* ¶ 31.)

When Jun loosened his hold, Valenzuela stated, "I can't breathe."  (*Id.* ¶ 35.)  Valenzuela then pulled Jun's arm away from his neck, briefly crawled along the floor, and stood up.  (*Id.* ¶ 38.)  As he ran toward the laundromat's front door, Wolfe followed him.  (*Id.* ¶ 42.)  When Wolfe got ahold of Valenzuela's shirt, Valenzuela slipped out of the shirt and continued running toward the front door.  (*Id.*)  Once outside the door, Wolfe tried to secure Valenzuela's arm as Jun attempted to tase him.  (Dkt. 90-1 Ex. K [Jun's Body-Worn Camera Footage, hereinafter "Jun BWC"] at 3:43–3:57.)  Valenzuela again escaped, running toward the laundromat parking lot.  (*See id.*)

The struggle continued in the laundromat parking lot.  With Wolfe attempting to restrain Valenzuela and Jun pushing his taser into Valenzuela's chest, Valenzuela fell on

his back.  (UMF ¶ 46.)[2]  While still on the ground, Valenzuela kicked Wolfe in the chest, causing him to go "flying back."  (*Id.* ¶ 47.)  Valenzuela then fled from the officers, this time across several lanes of traffic on Magnolia Avenue.  (*Id.* ¶ 49.)

## C.   7-Eleven Parking Lot

Now across the street, Valenzuela continued to flee the officers through several commercial parking lots.  (*Id.* ¶ 52.)  The officers repeatedly attempted to grab him with no success.  Jun kicked him once in the shin.  (*Id.* ¶ 53.)  Wolfe struck Valenzuela's leg twice with his baton.  (*Id.* ¶ 54.)  Despite the officers' repeated commands to "get on the ground," Valenzuela continued to run.  (*Id.* ¶ 55.)

As Valenzuela reached the parking lot of a 7-Eleven, he tripped on a curb and fell to the ground.  (*Id.* ¶ 56.)  Wolfe then got on top of Valenzuela and attempted to roll him onto his stomach.  (*Id.* ¶ 57.)  When he could not get Valenzuela on his stomach, Wolfe placed his arm around Valenzuela's neck to get into position to apply another restraint hold.  (*Id.* ¶ 59.)  Meanwhile, Jun took hold of Valenzuela's right arm.  (*Id.*)  As Wolfe got into position, Valenzuela used his left hand to pull Wolfe's arm away from his neck. (*Id.* ¶ 60.)  Wolfe testified that Valenzuela pulled Wolfe's finger back so hard that he believed it was going to break.  (*Id.* ¶ 62.)  With Jun still holding Valenzuela's right arm, Wolfe attempted another restraint hold.  (*Id.* ¶ 64.)

APD Sergeant Daniel Gonzalez, who heard a request for assistance from Wolfe, arrived to the scene to assist.  As Wolfe attempted to apply a restraint hold, Gonzalez took hold of Valenzuela's left arm while Jun still held his right.  (*Id.* ¶ 65.)  The parties

---

[2] Jun initially told an investigator that he applied the taser to Valenzuela approximately five times during this struggle.  (UMF. ¶ 45; DR ¶ 138.)  But after reviewing the body-worn camera footage, he testified that he did not in fact tase Valenzuela.  (*Id.*)

again dispute the type of restraint hold that Wolfe proceeded to apply.  Gonzalez testified that he observed Wolfe applying a proper carotid restraint that did not place pressure on Valenzuela's trachea.  (*Id*. ¶ 70.)  Plaintiffs contend that Gonzalez's body-worn camera shows that Wolfe applied an air choke hold, blocking Valenzuela's airway.  (*Id*. ¶ 67.)  The video footage shows Wolfe's right arm around Valenzuela's neck for at least sixty seconds.  (Dkt. 100 Ex. 11 [Gonzalez's Body-Worn Camera Footage, hereinafter "Gonzalez BWC"] at 1:01–2:02.)  Wolfe believes that much of that time was spent getting in position.  (SUF ¶¶ 76–77.)  He claims he only applied the actual restraint hold for fifteen to twenty seconds.  (*Id*.)

With three officers now holding onto Valenzuela, Gonzalez supervised Wolfe's application of what both Gonzalez and Wolfe claim was a carotid restraint hold.  (PAMF ¶ 175.)  Plaintiffs argue that from the footage, it is apparent that Valenzuela is wheezing and having difficulty breathing.  (SUF ¶ 60.)  Gonzalez testified that he did not observe Valenzuela having difficulty breathing and that even if he had, he would have told Wolfe to continue applying the carotid restraint hold because breathing issues "can be associated with many things."  (PAMF ¶ 137.)  Accordingly, Gonzalez twice directed Wolfe to "hold that choke."  (*Id*. ¶ 161.)  When Wolfe eventually loosened his hold but still had his arm around Valenzuela's neck, he rolled Valenzuela onto his stomach.  (*Id*. ¶ 78.)  Gonzalez then handcuffed Valenzuela's left arm and asked Wolfe, "Are you letting him breathe?"  (*Id*. ¶ 79.)  Wolfe responded that he was.  (*Id*.)

Gonzalez ordered the officers to roll Valenzuela onto his side.  (*Id*. ¶ 83.)  When Valenzuela did not regain consciousness, Gonzalez ordered the officers to start CPR.  (*Id*. ¶ 84.)  It was unsuccessful.  Gonzalez then called the paramedics, who transported Valenzuela to Western Anaheim Medical Center.  (*Id*. ¶ 86.)  He died there eight days later.  (*Id*.)

### D.    Medical Findings

Before he died, Valenzuela's blood tested positive for 0.163 mg/L of methamphetamine.  (*Id.* ¶ 87.)  The Orange County Sheriff's Coroner, Aruna Singhania, M.D., testified that this is a "low level" of methamphetamine but acknowledged that she is "not [an] expert" regarding drug levels.  (*Id.*; DR ¶ 128.)  After conducting an autopsy and watching body-worn camera footage from the day of the incident, Singhania concluded that Valenzuela's cause of death was "complications of asphyxia during struggle with law enforcement officers while under the influence of methamphetamine." (UMF ¶ 88.)  Valenzuela's autopsy showed acute hemorrhaging around his neck muscles and fracture of his hyoid bone.  (*Id.*)  Singhania testified that although she cannot say for certain, the most likely cause of Valenzuela's fractured hyoid bone was Wolfe's neck restraint hold in the 7-Eleven parking lot.  (*Id.*; DR ¶ 149.)

### E.    Two Related Actions

On February 15, 2017, Valenzuela's father brought an action against Defendants City of Anaheim, former Chief Raul Quezada, Sergeant Gonzalez, and Officers Jun and Wolfe ("*Valenzuela I*").  The First Amended Complaint asserts claims under 42 U.S.C. § 1983 for (1) violation of substantive due process, (2) supervisory liability, (3) excessive force, and (4) unlawful custom, policy, and practice.  Case No. 17-00278-CJC-DFM (C.D. Cal.), Dkt. 49.  On November 29, 2017, Valenzuela's two children, through their guardian, brought an action against the same Defendants ("*Valenzuela II*").  Case No. 17-02094-CJC-DFM (C.D. Cal.)  The First Amended Complaint in *Valenzuela II* asserts the same claims as *Valenzuela I*, plus state law claims for wrongful death and violation of civil rights pursuant to California Civil Code §§ 51.7, 52.1.  *Valenzuela I* and *II* have since been consolidated.  Defendants now move for summary judgment as to all claims. (Dkt. 88 [hereinafter "Mot."].)

# III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the

moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]."  *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor.  *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c).  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).

//

## IV.  DISCUSSION

### A.    Section 1983 Claims

Under section 1983, "[e]very person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  42 U.S.C. § 1983.  To establish a right to recovery under section 1983, the plaintiff must prove that the defendant "(1) deprived [him] of a right secured by the Constitution, and (2) acted under color of state law." *Collins v. Womancare*, 878 F2d 1145, 1147 (9th Cir. 1989).  Against Defendants Wolfe, Jun, and Gonzalez, Plaintiffs bring claims for deprivation of substantive due process rights and supervisory liability under the Fourteenth Amendment.  Plaintiffs also assert that the three officers employed excessive force in violation of the Fourth Amendment.  As to Defendants City of Anaheim, APD, and Chief Quezada, Plaintiffs claim they implemented an unlawful custom, policy, and practice regarding APD officers' use of the carotid restraint hold.

### 1.    Defendants Wolfe, Jun, and Gonzalez

#### a.      Substantive Due Process

In both actions, Plaintiffs allege that Defendants Wolfe, Jun, and Gonzalez violated their substantive due process rights under the Fourteenth Amendment.  Plaintiffs contend that the officers' conduct during their pursuit of Valenzuela deprived them of their liberty interest in the "companionship and society" of their father and son. *See Wilkinson v. Torres,* 510 F.3d 546, 554 (9th Cir. 2010) (recognizing the fundamental liberty interest of parents and children in the "companionship and society" of the other).

"Police conduct violates due process if it 'shocks the conscience.'" *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Porter v. Osborg*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  An officer's actions shock the conscience if the officer acts with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives." *Id*. (quoting *Porter*, 546 F.3d at 1137).  The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical." *Wilkinson*, 610 F.3d at 554.  However, where an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*.  "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *A.D.*, 712 F.3d at 454.

The parties agree that the purpose-to-harm standard applies here.  (Mot. at 10; Dkt. 95 [Pls.' Opp'n, hereinafter "Opp'n"] at 14.)  The undisputed facts indicate that actual deliberation was not practical.  *See Wilkinson*, 610 F.3d at 554.  As Wolfe and Jun approached Valenzuela in the laundromat, they almost immediately heard what they believed was the sound of a glass methamphetamine pipe breaking.  (UMF ¶ 11.)  Seconds later, Wolfe observed the screwdriver in Valenzuela's bag and told him to place his arms behind his back.  (*Id*. ¶¶ 19, 20.)  When Valenzuela did not comply, a series of nearly constant physical struggles ensued between Valenzuela and the officers.  From the moment the officers first made contact, they had to make a series of "snap judgment[s]" in response to Valenzuela's continued resistance and attempts to flee.  *See A.D.*, 712 F.3d at 454.  Accordingly, the purpose-to-harm standard applies.  *See Porter*, 546 F.3d at 1137 (applying purpose-to-harm standard where incident rapidly escalated over course of five minutes).

Applying the purpose-to-harm standard, there remains a genuine dispute of material fact as to whether the officers acted with a legitimate law enforcement objective.

Defendants assert that Wolfe, Jun, and Gonzalez acted only to minimize the risk to the safety of the officers and the safety of others.  (Mot. at 10.)  However, viewing the evidence in the light most favorable to Plaintiffs, it is disputed whether the officers acted to minimize a threat to themselves or others.  Once Wolfe and Jun caught up to Valenzuela in the 7-Eleven parking lot, Wolfe began to apply a restraint hold as Jun held his right arm.  (UMF ¶ 64.)  Seconds later, Gonzalez arrived and immediately grabbed hold of Valenzuela's left arm.  (*Id*. ¶ 65.)  At that point, Valenzuela had two officers holding each arm and Wolfe wrapped around his neck.  Neither Wolfe, Jun, nor Gonzalez ever saw a weapon on Valenzuela's person.  (DR ¶¶ 144, 145; Dkt. 88 Ex. E at 70:18–22.)  And based on the officers' body-worn camera footage, there were no members of the public in the parking lot.  Yet Gonzalez commanded Wolfe to continue to "hold that choke" around Valenzuela's neck, even after Valenzuela seemingly had stopped resisting the officers' attempts at restraint.  (*See* Gonzalez BWC at 1:01–2:02.)

Plaintiffs also offer evidence suggesting that the officers' actual purpose in applying the second restraint hold was to retaliate against Valenzuela for leading the officers on a chase.  (Opp'n at 15.)  Because Jun and Wolfe failed to restrain him inside the laundromat, they had to follow the then-shirtless Valenzuela across several lanes of traffic and through multiple commercial parking lots.  During one struggle, Valenzuela kicked Wolfe in the chest, causing Wolfe to go "flying back."  (UMF ¶ 47.)  When Valenzuela then tried to run away, Jun kicked him.  (*Id*. ¶ 48.)  Once Wolfe was on top of Valenzuela in the 7-Eleven parking lot, Wolfe thought Valenzuela might break his finger because he pulled it so hard.  (*Id*. ¶ 62.)  Wolfe then applied a restraint hold on Valenzuela's neck, even though two officers—Jun and Gonzalez—had at that point secured Valenzuela's arms.  Dr. Singhania concluded that the most likely cause of Valenzuela's fractured hyoid bone and asphyxiation was Wolfe's restraint hold.  (DR ¶ 149.)  Based on this evidence, a reasonable trier of fact could find that when three officers had hands on Valenzuela in the 7-Eleven parking lot, the officers' restraint hold

was motivated by a desire to teach Valenzuela a lesson for evading the officers, kicking Wolfe in the chest, and nearly breaking his finger.  Accordingly, Defendants' motion for summary judgment on the substantive due process claims is **DENIED**.

### b.    Supervisory Liability

Plaintiffs also allege supervisory liability under the Fourteenth Amendment against Sergeant Gonzalez.  (*See Valenzuela II*, Dkt. 10 at ¶ 46.)  Plaintiffs argue that Gonzalez had "an affirmative duty to intercede" in Wolfe's application of the restraint hold when he arrived to the 7-Eleven parking lot and assumed the role of "coach."  (Opp'n at 20.)[3]

Under section 1983, a supervisor can be held liable for the conduct of officers if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (internal quotation marks and citation omitted).  To impose supervisory liability, Plaintiffs must show that (1) Gonzalez personally participated in a constitutional violation, or (2) there is a "sufficient causal connection between [Gonzalez's] wrongful conduct and the constitutional violation."  *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 2012).  Courts have imposed supervisory liability "even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  *Id*. at 646 (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)) (internal quotation marks omitted).

---

[3] Defendants contend that Gonzalez cannot be held liable for the conduct of Jun and Wolfe prior to his arrival to the 7-Eleven parking lot.  The Court agrees.  Indeed, Plaintiffs have offered no evidence or argument for imposing supervisory liability on Gonzalez for events that occurred before he arrived.  (*See generally* Opp'n.)

A genuine dispute of material fact also remains as to whether Gonzalez "knowingly refused to terminate a series of acts" that he knew or reasonably should have known would cause Wolfe to inflict constitutional injury. *See Blankenhorn*, 485 F.3d at 485. Gonzalez testified that when he arrived to the scene, he did not know exactly what had transpired between Valenzuela and the officers. (Dkt. 88 Ex. E [Deposition of Daniel Gonzalez, hereinafter "Gonzalez Dep."] at 73:3–74:17.) He did not know whether Valenzuela was armed, nor did he have a reason to suspect Valenzuela was armed. (*Id.* at 70:18–22.) He also did not know that Jun had previously attempted a carotid restraint hold during which Valenzuela reported he could not breathe. (*See id.* at 199:24–200:13.) He knew only that a taser had been deployed and that Wolfe was currently attempting to get into position to apply the carotid restraint hold. (*Id.* ¶ 66.)

Based on this limited information, Gonzalez nevertheless determined that the carotid restraint hold, or whatever variation Wolfe was applying, was an appropriate force option. (Gonzalez Dep. at 73:3–74:17.) Indeed, he twice instructed Wolfe to "hold that choke." (PAMF ¶ 161.) Wolfe testified that he complied with the instructions of Gonzalez while administering the restraint hold. (*Id.* ¶ 162.) He also testified that he did not know why or did not question why the restraint hold was not abandoned at this point, given that Valenzuela was now secured by three officers. (*Id.* ¶ 175.) Gonzalez claims that he did not observe Valenzuela having difficulty breathing, but admitted that even if he did, he would have told Wolfe to "continue with that force option." (*Id.* ¶ 137.) However, during application of the restraint hold or shortly thereafter, Gonzalez also specifically asked Wolfe whether he was "letting [Valenzuela] breathe." (UMF ¶ 79.) Viewing this evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could find that Gonzalez failed to intervene in a series of acts that Gonzalez reasonably should have known deprived Valenzuela of his constitutional rights. Therefore, Defendants' motion for summary judgment as to the supervisory liability claim against Gonzalez is **DENIED**.

### c.      Excessive Force

Both Valenzuela's father and the Minor Plaintiffs allege that Defendants Jun, Wolfe, and Gonzalez employed excessive force in violation of the Fourth Amendment. (*Valenzuela I*, Dkt. 49 at ¶ 41; *Valenzuela II*, Dkt. 10 at ¶ 24.)  As a threshold matter, Valenzuela's father lacks standing to bring a survival action for excessive force under 42 U.S.C. § 1983 because Valenzuela was survived by his two children.  *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (holding that the party bringing a survival action based on a section 1983 claim for excessive force must meet the state's requirements for bringing that action); Cal. Civ. Proc. Code § 377.30 (stating that the right to bring a survival action passes to decedent's "successor in interest"); Cal. Prob. Code § 6402 (defining succession as requiring estate to pass first to the decedent's issue).  Thus, the Court addresses the excessive force claim brought by the Minor Plaintiffs only.

The inquiry on an excessive force claim is whether the officers' actions were "objectively reasonable" in light of the facts and circumstances before them.  *Graham v. Connor*, 490 U.S. 386, 397 (1980).  The Court assesses reasonableness using the nonexhaustive *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. at 396.  The most important factor is whether the suspect poses an immediate threat.  *Mattos v. Agaraon*, 661 F.3d 433, 441 (9th Cir. 2011).  Ultimately, the Court evaluates the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. at 396.  However, where the reasonableness of the officer's conduct turns on disputed issues of material fact, the question is one that should be left for the jury.  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

A genuine dispute of material fact also remains as to whether Jun and Wolfe's conduct was objectively reasonable.  The parties dispute the amount of force that Jun and Wolfe employed when applying their respective restraint holds.  Defendants contend that Jun and Wolfe applied, or attempted to apply, a carotid restraint hold.  (*See* UMF ¶¶ 25, 67, 70.)  Plaintiffs argue the officers clearly used an air choke hold that obstructed Valenzuela's airway.  (*See id.*)  At the time, APD policy provided that the carotid restraint hold was proper only to control a subject who is "violent or physically resisting."  (Ciscel Decl. ¶ 6; Dkt. 88 Ex. J-1 [APD Policy] at 300.3.4(b).)  APD policy provided that the air choke hold, by contrast, was proper only when use of deadly force was justified.  (DR ¶ 177.)  It is undisputed that Wolfe, Jun, and Gonzalez did not believe that deadly force was justified at the time of Valenzuela's arrest.  (*Id.* ¶ 134.)  Yet Valenzuela's autopsy report concludes that Valenzuela's hyoid bone was fractured and that he died from "complications of asphyxia."  (*Id.* ¶ 149.)  If Jun or Wolfe incorrectly applied the carotid restraint so as to exert pressure on Valenzuela's trachea or purposefully applied an air choke hold when deadly force was not warranted, a reasonable trier of fact could conclude that the officers' use of force was excessive.  Accordingly, Defendants' motion for summary judgment as to the excessive force claim against Jun and Wolfe is **DENIED**.  *See Solomon v. City of So. Lake Tahoe*, 2014 WL 6389735, at *6 (E.D. Cal. Nov. 14, 2014) (finding summary judgment on excessive force claim improper where "genuine issues of disputed material fact exist as to the amount of force" used).

A genuine dispute of material fact also remains as to whether Gonzalez's conduct was objectively reasonable.  As already noted, Gonzalez did not know what had transpired between Valenzuela and the officers when he arrived to the 7-Eleven parking lot.  He seemingly did not know whether Valenzuela was accused of any crime, let alone the severity of that crime.  (*See generally* UMF ¶¶ 67–69.)  He simply observed Valenzuela on the ground, with Jun holding his left arm and Wolfe gripping his neck.

Still, Gonzalez concluded that a restraint hold was the appropriate force option and directed Wolfe to maintain "that choke."  He also testified that Wolfe's force option was appropriate regardless of whether Valenzuela had difficulty breathing, even though APD policy explicitly mandated that a restraint hold blocking a subject's airway is appropriate only in situations that call for deadly force.  (*See* PAMF ¶ 137; DR ¶ 177.)  A reasonable jury could conclude that based on the information before Gonzalez, the continued application of a restraint hold was not objectively reasonable when Valenzuela no longer posed an "immediate threat" to officer or civilian safety.  *See Graham*, 490 U.S. at 396. Defendants' motion for summary judgment as to the excessive force claim against Gonzalez is likewise **DENIED**.

### d.      Qualified Immunity

Defendants assert that Wolfe, Jun, and Gonzalez are entitled to qualified immunity on Plaintiffs' section 1983 claims.  (Mot. at 17–20.)  Qualified immunity shields public employees from civil liability under section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether a public employee is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the employee's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  As noted above, a jury could reasonably conclude that Wolfe, Jun, and Gonzalez's conduct violated constitutional rights.

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood *what he is doing* violates that right."  *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015)) (per curiam) (emphasis in *Hamby*).  "Although a plaintiff need not

find 'a case directly on point, existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* at 1091 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2001)).  The Court must make its inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As to Plaintiffs' substantive due process and supervisory liability claims, it was clearly established law on July 2, 2016 that "a police officer who act[s] with the purpose to harm a civilian, unrelated to the legitimate law enforcement objectives of arrest, self-defense, or the defense of others, violate[s] the Fourteenth Amendment due process clause." *A.D.*, 712 F.3d at 454.  The Ninth Circuit has stated that this standard is so "obvious" that qualified immunity is inapplicable even without a case directly on point. *Id.* at 455.  For the reasons already stated, the evidence supports a reasonable inference that Wolfe, Jun, and Gonzalez acted with a purpose to harm that was unrelated to legitimate law enforcement objectives.  Consequently, the officers are not entitled to qualified immunity on Plaintiffs' substantive due process claims.

With respect to the Minor Plaintiffs' excessive force claim, it was clearly established on the day of the incident that deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Wolfe, Jun, and Gonzalez all testified that they did not believe deadly force was warranted during their encounter with Valenzuela.  (PAMF ¶ 134.)  There remains a genuine dispute of material fact as to whether the restraint holds at issue here—whether a misapplied carotid restraint hold or an air choke hold—constituted excessive force.  Accordingly, the officers are not entitled to qualified immunity on summary judgment of Plaintiffs' excessive force claim. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) (stating that "where the officers' entitlement to qualified immunity depends on the

resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

## 2. Defendants City of Anaheim, APD, and Quezada

Plaintiffs assert a section 1983 claim against the City of Anaheim, APD, and former Chief of Police Quezada for implementing a purportedly unlawful custom, policy, and practice regarding application of the carotid restraint hold.[4]  It is well established that a municipality, such as the City of Anaheim, cannot be held liable under section 1983 for the acts of its employees under the theories of *respondeat superior* or vicarious liability. *Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  Rather, a municipality can only be held liable if it participated in the wrongdoing through its rules, policy, custom, or practice. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 435 U.S. 658, 690–91 (1978); *Mendiola-Martinez v. Arpaio*, 835 F.3d 1239, 1247 (9th Cir. 2016).  Under *Monell*, a plaintiff may establish municipal liability under section 1983 by showing (1) the municipality had a longstanding practice or custom that constitutes the municipality's standard operating procedure, (2) an official with final policymaking authority made the decision, or (3) an official with final policymaking authority either delegate that authority to, or ratified the decision of, a subordinate.  *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 984–85 (9th Cir. 2002).

---

[4] At the hearing on Defendants' motion, Plaintiffs also argued that APD's training regarding the carotid restraint hold is "deficient" and "inadequate."   In support of this assertion, they pointed to evidence that indicates APD uses the terms "choke hold" and "carotid hold" interchangeably when referring to the carotid restraint hold.  (PAMF ¶¶ 164, 165, 166.)  Plaintiffs assert that the term "choke hold" could be misinterpreted to refer to a restraint blocking a subject's airway, leading to confusion amongst APD officers about which hold to apply.  When specifically asked, Plaintiffs stated they are not asserting a section 1983 claim for failure to train on this basis.  If Plaintiffs intend to assert a claim for failure to train, they must seek leave to amend the complaint.

Plaintiffs challenge APD's written policy that states the carotid restraint hold is an appropriate method for subduing violent or physically resisting subjects even where deadly force is not warranted.  Plaintiffs assert that in light of the risks inherent in applying the carotid restraint hold—particularly the risk that the subject might be choked to death—APD should only allow the carotid restraint hold to be applied in circumstances that call for deadly force.  To establish *Monell* liability for Valenzuela's death based on a policy , Plaintiffs must prove "(1) that [Valenzuela] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks and citation omitted).

APD policy authorizes its officers to use the carotid restraint hold whenever it is "reasonably . . . necessary" to control a subject who is "violent or physically resisting," or a subject who "has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others."  (Dkt. 88 Ex. J-1 [APD Policy] at 300.3.4.)  Due to the carotid restraint hold's "potential for injury," officers are discouraged from using the hold on pregnant women, the elderly, and juveniles, unless the officer "reasonably believes that the need to control the individual outweighs the risk" of applying the hold.  (*Id.*)  Officers Wolfe, Jun, and Gonzalez testified that APD specifically trains its officers to avoid pressure on the trachea when applying the carotid restraint hold, (UMF ¶ 98), to avoid repeated applications of the carotid restraint hold in a short period of time, (*id.* ¶ 103), and to not apply the carotid restraint hold for an extended period of time, (*id.* ¶ 97).  Although the APD Office of Independent Review has specifically recommended that the carotid restraint hold be used only when the use of deadly force is objectively reasonable, APD continues to train its officers to use the hold

in circumstances where deadly force is not justified.  (*See* Dkt. 96-5 [Deposition of
Dustin Ciscel] at 97:18–98:4.)[5]

A genuine dispute of material fact remains as to whether APD's policy regarding
the carotid restraint hold amounts to "deliberate indifference" of constitutional rights.
APD instructs its officers to use the carotid restraint hold in situations that do not call for
deadly force, despite APD's apparent knowledge of the risks associated with the hold.
The language of APD's own policy indicates that APD is aware that the carotid restraint
hold has "the potential for injury."  (Dkt. 88 Ex. J-1 at 300.3.4.)  Indeed, APD policy
requires any individual who has been subjected to the carotid restraint hold to be
"promptly examined by paramedics or other qualified medical personnel and . . .
monitored until examined by paramedics or other appropriate medical personnel."  (*Id*. at
300.3.4(d).)  Given that APD explicitly instructs its officers to avoid applying pressure on
the subject's trachea during a carotid restraint hold, APD also seemingly recognizes the
risk that an officer applying the hold will improperly apply pressure on the trachea,
thereby blocking the subject's airway.  Still, APD has refused to adopt the Office of
Independent Review's recommendation to reclassify the carotid restraint hold as reserved
for circumstances necessitating deadly force.  Viewing this evidence in the light most
favorable to Plaintiffs, a reasonable jury could find that the APD's policy endorsing
application of the carotid restraint hold in non-deadly force circumstances "amounted to
deliberate indifference to constitutional or statutory rights."  *See Connick v. Thompson*,
563 U.S. 51, 61 (2011).  Given that Jun and Wolfe both applied what they believed was a
carotid restraint hold in accordance with APD policy, a reasonable jury could also
conclude that this policy was the moving force behind the constitutional violations at

---

[5] Defendants object to Sergeant Ciscel's testimony regarding the Office of Independent Review's
recommendation as hearsay.  (DR ¶ 133.)  Plaintiffs offer this testimony for its effect on the listener and
not for the truth of the matter asserted.  Accordingly, Defendants' objection is OVERRULED.

issue here.  Accordingly, Defendants' motion for summary judgment on Plaintiffs' *Monell* claim against the City of Anaheim and APD is **DENIED**.[6]

## B. State Law Claims

The Minor Plaintiffs also assert state law claims for wrongful death and violation of civil rights against all Defendants.  California Civil Code § 52.1, known as the Bane Act, authorizes an action for injunctive and other equitable relief against a person who "interferes or attempts to interfere, 'by threat, intimidation, or coercion,' with the exercise or enjoyment by any individual or individuals of rights secured by state or federal law." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 66 (2015); *see* Cal. Civ. Code § 52.1. To state a claim under the Bane Act, Plaintiffs must provide proof of "a specific intent to violate [an individual's] right to freedom from unreasonable seizure." *Cornell v. City & Cty. of S.F.*, 17 Cal. App. 5th 766, 801–02 (2017); *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (applying *Cornell*).

Defendants argue that Plaintiffs have failed to state a wrongful death or Bane Act claim because (1) there is no evidence that the officers acted with a specific intent to violate Valenzuela's civil rights, and (2) the "uncontroverted evidence demonstrates" that the officers' use of force was objectively reasonable.  (Mot. at 23–24.)  For the reasons stated in the discussion of Plaintiffs' substantive due process and excessive force claims, there remains a genuine dispute of material fact as to whether the officers acted with a purpose to harm Valenzuela and whether their use of force was objectively reasonable.

---

[6] While Plaintiffs also asserted their claims for unlawful custom, policy, and practice against former Chief Quezada, they have offered no evidence in their moving papers that supports imposing liability on him for any custom, policy, or practice.  (*See* Opp'n at 22–23.)  In fact, Plaintiffs' moving papers offer no evidence whatsoever regarding Quezada's conduct or role in the instant action.  Accordingly, the Court GRANTS Defendants' motion for summary judgment on the unlawful custom, policy, and practice claim as to Chief Quezada.

Accordingly, Defendants' motion for summary judgment on the wrongful death and Bane Act claims is **DENIED**.[7]

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED IN SUBSTANTIAL PART**.  The Court **GRANTS** Defendants' motion as to all claims against Defendant Quezada.  The Court **DENIES** the motion as to all claims against the remaining Defendants.

DATED:    February 12, 2019

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[7] Defendants have raised several evidentiary objections in response to Plaintiffs' evidence.  (Dkt. 104; *see generally* DR.)  Because the Court does not rely on any of this contested evidence, it need not rule on Defendants' objections.