**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FERMIN VINCENT VALENZUELA; V.V., by and through their Guardian, Patricia Gonzalez, individually and as successors-in-interest of Fermin Vincent Valenzuela, II, deceased; X.V., by and through their Guardian, Patricia Gonzalez, individually and as successors-in-interest of Fermin Vincent Valenzuela, II, deceased, *Plaintiffs-Appellees*, | No. 20-55372 D.C. Nos. 8:17-cv-00278-CJC-DFM 8:17-cv-02094-CJC-DFM OPINION |
| v. | |
| CITY OF ANAHEIM; DANIEL WOLFE; WOOJIN JUN; DANIEL GONZALEZ, *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted May 5, 2021
Pasadena, California

Filed August 3, 2021

Before:  John B. Owens and Kenneth K. Lee, Circuit
Judges, and Michael H. Simon,[*] District Judge.

Opinion by Judge Owens;
Dissent by Judge Lee

---

## SUMMARY[**]

### Civil Rights

The panel affirmed a jury verdict awarding "loss of life" damages to the family of Fermin Valenzuela, Jr., who died after an encounter with the police.

Valenzuela's father and children filed suit under 42 U.S.C. § 1983 and California law for excessive force, wrongful death, and similar theories of liability.  After a five-day trial, the jury awarded the Valenzuela family a total of $13.2 million in damages on multiple theories of liability, including $3.6 million for Valenzuela's loss of life, which was independent of any pain and suffering that he endured during and after the struggle with the officers.  In their post-trial motions, the Defendants argued that because California state law did not recognize loss of life damages, neither should § 1983.  The district court disagreed.  After reviewing the relevant in- and out-of-circuit case law, including *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir.

---

[*] The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

2014), the district court concluded that § 1983 permitted the recovery of loss of life damages and that California state law to the contrary was inconsistent with the federal statute's goals.

The panel saw no meaningful way to distinguish *Chaudhry* from this case. Both involved deaths caused by a violation of federal law, and both considered the limits that California's Civil Procedure Code § 377.34 places on § 1983 plaintiffs, limits that this court has squarely rejected. The panel determined that prohibiting loss of life damages would run afoul of § 1983's remedial purpose as much as (or even more than) the ban on pre-death pain and suffering damages. Following *Chaudhry*, the panel held that § 377.34's prohibition of loss of life damages was inconsistent with § 1983.

The panel resolved the remaining issues on appeal, including qualified immunity, in a concurrently filed memorandum disposition.

Dissenting, Judge Lee stated that this court should not jettison California state law to maximize damages for § 1983 plaintiffs. Judge Lee wrote that as tragic as Valenzuela's death was, the panel must follow the law, and California law prohibits damages for loss of life. While Judge Lee did not believe *Chaudhry* controlled this case, he thought this court should still revisit that decision in a future en banc proceeding because it misconstrued *Robertson v. Wegmann*, 436 U.S. 584, 590–91 (1978), and relied on flawed assumptions.

4          VALENZUELA V. CITY OF ANAHEIM

### COUNSEL

Timothy T. Coates (argued) and Peter A. Goldschmidt, Greines Martin Stein & Richland LLP, Los Angeles, California; Steven J. Rothans and Jill Williams, Carpenter Rothans & Dumont LLP, Los Angeles, California; Robert Fabela, City Attorney; Moses W. Johnson, Assistant City Attorney; City Attorney's Office, Anaheim, California; for Defendants-Appellants.

Dale K. Galipo (argued) and Hang D. Le, Law Offices of Dale K. Galipo, Woodland Hills, California; John Fattahi, Law Office of John Fattahi, Torrance, California; Garo Mardirossian and Lawrence D. Marks, Mardirossian & Associates Inc., Los Angeles, California; for Plaintiffs-Appellees.

Christopher D. Hu (argued), San Francisco, California, for Amicus Curiae

Steven S. Fleischman, Scott P. Dixler, and Yen-Shang Tseng, Horvitz & Levy LLP, Burbank, California, for Amicus Curiae Association of Southern California Defense Counsel.

Michael E. Gates, City Attorney; Brian L. Williams, Chief Trial Counsel; Daniel S. Cha and Pancy Lin, Senior Deputy City Attorneys; Office of the City Attorney, Huntington Beach, California; for Amicus Curiae City of Huntington Beach.

Steven J. Renick, Manning Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Amicus Curiae International Municipal Lawyers Association.

## OPINION

OWENS, Circuit Judge:

The City of Anaheim and individual officers ("Defendants") appeal from a jury verdict awarding "loss of life" damages to the family of Fermin Valenzuela, Jr., who died after an encounter with the police. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Death of Valenzuela

On July 2, 2016, Anaheim Police Department Officers Woojin Jun and Daniel Wolfe received a 911 dispatch about a "suspicious person" near a laundromat in Anaheim. The dispatcher described Valenzuela's appearance, indicated that no weapons had been seen, and noted that it was unknown whether Valenzuela was on drugs or required psychiatric assistance.

Arriving at the scene, the officers spotted Valenzuela and followed him into the laundromat, where they observed him moving clothing from a bag into a washing machine. As they approached, Wolfe said he heard the sound of breaking glass and saw what he recognized as a methamphetamine pipe. Wolfe then asked Valenzuela whether he was "alright" and if he had just "br[oke] a pipe or something." Valenzuela replied that he was "good" and "just trying to wash" his clothes.

---

[1] This opinion only addresses the issue of loss of life damages. A concurrently filed memorandum disposition resolves the remaining issues on appeal, including qualified immunity.

Wolfe claimed that he then saw a screwdriver in the bag, so he ordered Valenzuela to stop and put his hands behind his back.  Valenzuela stepped away from the bag but did not immediately comply.  Wolfe then grabbed Valenzuela's right arm and tried to pull it behind his back.  Almost immediately after, Jun placed Valenzuela in a choke hold as Wolfe tried to maintain control of Valenzuela's hands.[2]

A violent struggle ensued, with Jun continuing the choke hold while the officers managed to knock Valenzuela to the floor, face down.  Jun then initiated a second choke hold, and Valenzuela started turning purple and repeatedly screamed "I can't breathe" and "help me."  Wolfe then tased Valenzuela, who jumped to his feet and ran out of the laundromat.  The officers chased after Valenzuela, pulling off some of his clothes as he tried to escape and knocking him to the ground.  The officers repeatedly tased Valenzuela, who begged for them to "stop it."

Despite multiple choke holds and taser attacks, Valenzuela ran across the street with the officers in pursuit. Out of breath, Valenzuela repeatedly asked the officers to "please don't" and "don't kill me."  He managed to make it to a convenience store parking lot, where he tripped and fell to the ground.  While on the ground, Wolfe placed Valenzuela in yet another choke hold.  Again, Valenzuela turned purple, repeatedly screamed "help me" and "stop it,"

---

[2] The parties dispute whether the officers placed Valenzuela in a carotid hold or an air choke hold.  A carotid hold involves compressing the carotid arteries on both sides of the neck.  When properly applied, the hold should render someone unconscious within seven to ten seconds.  But when improperly applied, a carotid hold can turn into an air choke hold, which applies pressure to the front of the neck and is much more dangerous.  Without resolving this dispute, we use the term "choke hold" to describe the neck restraints placed on Valenzuela.

and was audibly gasping for air.  Sergeant Daniel Gonzalez, a supervisory officer, arrived on the scene and encouraged Wolfe to "hold that choke" and "put him out," and gave Wolfe tips on how to accomplish this.  Wolfe maintained the hold for between one and two minutes as Jun and Gonzalez held down Valenzuela's arms.

Towards the end of the encounter, Gonzalez asked Wolfe whether Valenzuela was able to breathe.  Gonzalez told the officers to roll Valenzuela on his side because he was "going to wake up."  Valenzuela never did, and he fell into a coma and died eight days later in the hospital.  The Orange County medical examiner ruled the manner of death as a homicide caused by "complication[s] of asphyxia during the struggle with the law enforcement officer" while Valenzuela was "under the influence of methamphetamine."

**B.  Procedural History**

Valenzuela's father and children filed suit under 42 U.S.C. § 1983 and California law for excessive force, wrongful death, and similar theories of liability.  After a five-day trial, the jury awarded the Valenzuela family a total of $13.2 million in damages on multiple theories of liability, including $3.6 million for Valenzuela's "loss of life,"[3] which was independent of any pain and suffering that he endured during and after the struggle with the officers.[4]

---

[3] The Ninth Circuit's Model Civil Jury Instruction 5.2 also recognizes damages for the "loss of enjoyment of life."

[4] The other awards were $6 million for Valenzuela's pre-death pain and suffering and $3.6 million for his children's loss of Valenzuela's love, companionship, society, and moral support.

In their post-trial motions, the Defendants argued that because California state law did not recognize loss of life damages, neither should § 1983.    The district court disagreed.    After reviewing the relevant in- and out-of-circuit case law, including *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014), the court concluded that § 1983 permitted the recovery of loss of life damages and that California state law to the contrary was inconsistent with the federal statute's goals.   As the court recognized, to hold otherwise "would undermine the vital constitutional right against excessive force—perversely, it would incentivize officers to aim to kill a suspect, rather than just harm him." This appeal followed.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo the district court's decision regarding loss of life damages.  *See Chaudhry*, 751 F.3d at 1103.

### B.  Section 1983 and "Loss of Life" Damages

California law forbids recovery for a decedent's loss of life.   Cal. Civ. Proc. Code § 377.34.[5]   And because the relevant federal law is silent as to loss of life damages, California law controls our inquiry "unless it is inconsistent

---

[5] Section 377.34 provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred *before death*, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Cal. Civ. Proc. Code § 377.34 (emphasis added).

with the policies of § 1983." *Chaudhry*, 751 F.3d at 1103. We conclude that it is, mindful that § 1983 was meant to be a remedial statute and should be "broadly construed" to provide a remedy "against all forms of official violation of federally protected rights." *Dennis v. Higgins*, 498 U.S. 439, 445 (1991) (citation omitted); *see also Wilson v. Garcia*, 471 U.S. 261, 271–72 (1985) ("[Section] 1983 provides a 'uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution' . . . [that] make[s] it appropriate to accord the statute 'a sweep as broad as its language.'" (internal citation omitted)), *superseded by statute on other grounds*.  Section 1983's goals include compensation for those injured by a deprivation of federal rights and deterrence to prevent future abuses of power. *Robertson v. Wegmann*, 436 U.S. 584, 591 (1978).

Our analysis begins, and largely ends, with *Chaudhry*. In that case, we addressed whether § 377.34's prohibition of pre-death pain and suffering damages prevented § 1983 plaintiffs from obtaining such relief.  We recognized that "[o]ne of Congress's primary goals in enacting § 1983 was to provide a remedy for killings unconstitutionally caused or acquiesced in by state governments," and that "[i]n cases where the victim dies quickly, there often will be no damage remedy at all under § 377.34." *Chaudhry*, 751 F.3d at 1103–04.  Because California's bar on such relief had "the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim," we held that it clashed with § 1983's remedial purpose and undermined its deterrence policy.  *Id*. at 1104–05.  "Section 377.34 therefore does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law." *Id*. at 1105.

In reaching this conclusion, *Chaudhry* relied in part on *Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984), *overruled in part on other grounds by Russ v. Watts*, 414 F.3d 738 (7th Cir. 2005), a § 1983 case which rejected Wisconsin laws precluding loss of life damages because they made it "more advantageous [for officials] to kill rather than injure."[6]  In doing so, *Chaudhry* implicitly disagreed with the Sixth Circuit's contrary decision in *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601, 603 (6th Cir. 2006), which held that § 1983 did not conflict with a similar Michigan law because § 1983 compensates only for "actual damages suffered by the victim," and a loss of life "is not 'actual' . . . because it is not consciously experienced by the decedent."

We see no meaningful way to distinguish *Chaudhry* from this case.[7]  Both involve deaths caused by a violation of federal law, and both consider the limits that California's § 377.34 places on § 1983 plaintiffs—limits that we have squarely rejected.  Prohibiting loss of life damages would run afoul of § 1983's remedial purpose as much as (or even

---

[6] *Chaudhry* also relied on similar cases from the Tenth and Second Circuits.  *See Chaudhry*, 751 F.3d at 1104–05 (first citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1506 (10th Cir. 1990) (rejecting an Oklahoma state law that limited survival damages to property loss and lost earnings as inconsistent with § 1983); and then citing *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir. 1983) (holding the same for a New York law barring punitive damages in § 1983 survival actions)).

[7] Although district courts in our circuit once were split over the availability of loss of life damages under § 1983, they are unanimous after *Chaudhry*.  *See Estate of Casillas v. City of Fresno*, No. 16-CV-1042, 2019 WL 2869079, at *16 (E.D. Cal. July 3, 2019) ("Critically, . . . the cases in California federal district courts denying survival damages, including 'loss of enjoyment of life' damages, are pre-*Chaudhry*; and courts in this district have authorized hedonic damages in the post-*Chaudhry* landscape.").

more than) the ban on pre-death pain and suffering damages. Following *Chaudhry*, we therefore hold that § 377.34's prohibition of loss of life damages is inconsistent with § 1983.

The Defendants' attempts to distinguish *Chaudhry* fall flat.  First, the Defendants argue that the injury in this case is different because unlike pre-death pain and suffering, a person cannot "actually experience" the phenomenon of being dead.  But we already rejected this quasi-metaphysical argument in *Chaudhry* when we endorsed the Seventh Circuit's analysis in *Bell*, which identified the rationale behind Wisconsin's restrictive statute—"that the victim once deceased cannot practicably be compensated for the loss of life to be made whole"—and, in light of § 1983's broad remedial purpose and deterrence goal, rejected the state law anyway.  *Bell*, 746 F.2d at 1236, 1239–40.

Second, the Defendants contend that the damages in this case are already adequate:  Even if Valenzuela's family could not recover the $3.6 million loss of life award, they would still receive $9.6 million in pre-death pain and suffering and wrongful death damages, which sufficiently serves § 1983's deterrent purpose.  But the above awards address different injuries.  One can endure pain and suffering separately from dying, while another can die painlessly and instantly.  "[T]o further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question." *Carey v. Piphus*, 435 U.S. 247, 258–59 (1978).  Additionally, such a framework would still preclude recovery for the decedent who is penniless, without family, and killed immediately on the scene.  That reading is not tenable in light of § 1983's remedial purpose. *See Zinermon v. Burch*, 494 U.S. 113, 124

(1990) ("[Section] 1983 was intended not only to . . . provide a remedy for violations of civil rights 'where state law was inadequate,' but also to provide a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'" (citation omitted)).

Finally, the Defendants argue that loss of life damages are too speculative because juries have never experienced death.  But juries are regularly asked to assess damages without direct sensory experience of the issue before them—including, in this case, for pre-death pain and suffering.  And it is still better for juries to decide whether a plaintiff has received sufficient compensation than for our court to draw arbitrary lines denying compensation entirely.[8]

At bottom, the Defendants ask us to overrule *Chaudhry*. Not only is this outside our authority as a three-judge panel, but it is also inconsistent with the Supreme Court's repeated reminders of § 1983's goals and remedial purpose.

**AFFIRMED.**

---

LEE, Circuit Judge, dissenting:

Fermin Valenzuela, Jr. did not deserve to die, even if he defied police orders and forcefully resisted arrest.  His father did not deserve to lose his son.  His two children did not deserve to lose their father.  Valenzuela's family deserves compensation.  And the jury agreed: In a civil suit filed by his estate and his surviving family members against the City

---

[8] Contrary to the dissent's contention that we are mandating maximizing recovery, we continue to leave it to juries to decide the appropriate award in each case.

of Anaheim and its police officers, the jury awarded
$13.2 million in damages — $6 million for pre-death pain
and suffering, $3.6 million for wrongful death, and another
$3.6 million for loss of life.

As tragic as his death was, we must follow the law —
and California law prohibits damages for loss of life. That
means Valenzuela's estate and his family members should
receive $9.6 million instead of $13.2 million. The majority
opinion, however, holds that they are entitled to the full
$13.2 million, ruling that federal common law supplants
California law because it is "inconsistent" with § 1983's
goals of deterrence and compensation. *Chaudhry v. City of
Los Angeles*, 751 F.3d 1096, 1103 (9th Cir. 2014).

But an award of $9.6 million (for wrongful death and
pain and suffering) is not "inconsistent" with deterrence or
compensation. We can respect state law enacted by the
people of California *and* still meet the twin policy goals of
§1983. We should not jettison California state law to
maximize damages for §1983 plaintiffs. I thus respectfully
dissent.

## I. Section 1983 does not require us to maximize damages.

Section 1983 serves as a powerful tool to vindicate the
constitutional rights of people who have suffered harm at the
hands of the government. 42 U.S.C. § 1983. But because
federal law does not provide for damages in § 1983 actions,
state law governs the availability of damages unless it is
"inconsistent" with the twin policy goals of § 1983,
compensation and deterrence. *See Robertson v. Wegmann*,
436 U.S. 584, 590–91 (1978); 42 U.S.C. §1988(a). And for
better or worse, California decided to bar "loss of life"
damages in civil cases (though it allows a panoply of other

damages, including wrongful death and punitive damages).
Cal. Civ. Proc. Code § 377.34.**1**  So we must determine
whether California's ban on loss of life damages is
"inconsistent" with the goals of compensation and
deterrence. *Id*.

Our analysis should start with the Supreme Court's
decision in *Robertson v. Wegmann*, 436 U.S. 584 (1978).
The plaintiff there had sued the government for violating his
constitutional rights but he passed away before trial, and his
estate tried to substitute itself as the plaintiff.  Louisiana's
statute, however, extinguished a person's tort claims at
death, thus preventing an estate from recovering *anything*
under § 1983.  And because the plaintiff had no family
members when he died, Louisiana's law effectively barred
any damages.  436 U.S. at 590–91.  While the unique facts
of that particular case led to no recovery and perhaps an
unjust result, the Court held that the state law was not
"inconsistent" with § 1983 because "most Louisiana actions
survive the plaintiff's death."  *Id*.  Writing for the Court,
Justice Marshall explained that despite "the broad sweep of
§ 1983, we can find nothing in the statute or its underlying
policies to indicate that state law causing abatement of a
particular action should invariably be ignored in favor of a
rule of absolute survivorship."  *Id.* at 590–91.  In other
words, the Court suggested that § 1983 does not trump state

---

**1** Section 377.34 provides: "In an action or proceeding by a
decedent's personal representative or successor in interest on the
decedent's cause of action, the damages recoverable are limited to the
loss or damage that the decedent sustained or incurred *before death*,
including any penalties or punitive or exemplary damages that the
decedent would have been entitled to recover had the decedent lived, and
do not include damages for pain, suffering, or disfigurement."  Cal. Civ.
Proc. Code § 377.34 (emphasis added).

law just because it does not provide maximum recovery for plaintiffs.

But *Robertson* left open a more complex question: Would a similar state law conflict with § 1983 if the challenged governmental conduct directly caused the plaintiff's death? *Id.* at 594. In *Chaudhry*, we answered this question in the narrow context of damages for pre-death pain and suffering. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). In that case, a police officer shot and killed a 21-year-old autistic man sleeping in front of an apartment building. The police officer alleged that he had lunged towards him with a knife, a claim that was hotly contested at trial. A jury awarded his estate $1 million for pain and suffering, but California law bans damages for pre-death pain and suffering (though California allows someone who does *not* die to sue for pain and suffering). This court reasoned that in "cases where the victim dies quickly" and does not suffer any pain and suffering, "there often will be no damage remedy at all." *Id.* The opinion also noted that "a prohibition against pre-death pain and suffering awards for a decedent's estate has the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." *Id.* Based on the facts of that case, this court held that California's ban on pre-death pain and suffering was "inconsistent" with §1983's goals of deterrence and compensation. *Id.*

The majority believes that *Chaudhry* controls this case. It interprets that decision to allow federal common law to displace not only California's ban on pre-death pain and suffering (which was at issue in *Chaudhry*) but also the prohibition on loss of life damages (which is at issue here). I do not read *Chaudhry* as broadly as the majority does and

believe it would be unwise to expand its reach to loss of life damages (more on that later).

California's bar on loss of life damages does not undermine § 1983's goal of deterrence. This case is a prime example. Not only are the defendants on the hook for $9.6 million, but they will also likely have to shell out millions more in attorneys' fees. An eight-figure judgment deters even the largest city or police department. *Chaudhry* also highlighted the potentially perverse incentive of allowing someone who does *not* die to obtain pain and suffering damages but barring someone who does die from receiving those same damages. *Id.* But that incongruity does not exist for loss of life damages because someone who does not die cannot seek them. Thus, to borrow the language of *Chaudhry*, California's bar on loss of life damages does not make death more "economically advantageous" than injury. *Id.*

Nor does California's bar on loss of life damages undermine the goal of compensation. *Chaudhry* specifically focused on the danger that "there often will be *no damage remedy at all*" if someone dies quickly and experiences no pain and suffering. *Id.* at 1105 (emphasis added). Under those particular facts, California's state law might be "inconsistent" with § 1983's goals of deterrence and compensation. But that is not the case here. Here, even without loss of life damages, Valenzuela's estate and his children will still receive $9.6 million. While no amount of money can replace the loss of Valenzuela's life, that nearly eight-figure award is not *inconsistent* with § 1983's compensatory goal, especially given that pre-death pain and suffering damages are now recoverable under *Chaudhry*.

The majority warns that California's bar against loss of life damages may hypothetically "preclude recovery for the

decedent who is penniless, without family, and killed immediately on the scene." *Maj. Op.* at 11.  But the Supreme Court has already rejected that argument:  In assessing whether a state law is "inconsistent" with § 1983's goals, we cannot refuse to apply a state law just because it "caus[es] abatement of a *particular* action."  *Robertson*, 36 U.S. at 590–91 (emphasis added).  Rather, we must take a broader view to see if the state law denies recovery under § 1983 in "*most*" cases.  *Id.* (upholding a state damages bar because "most Louisiana actions survive the plaintiff's death").  Put another way, courts cannot abrogate a state law just because it may lead to a seemingly unjust result in a particular § 1983 case.  That is why the Court in *Robertson* upheld the Louisiana state law: Even though it meant that the plaintiff's estate would not receive a penny, it was not "inconsistent" with § 1983 because plaintiffs in most cases would still obtain damages.

The majority opinion also suggests that the pain and suffering and wrongful death damages do not adequately compensate Valenzuela's estate and his surviving family members because these "awards address different injuries." *Maj. Op.* at 11.  But neither § 1983 nor any court decision suggests that we can ignore a state law unless it mandates damages for each theory of harm suffered by the plaintiff or his survivors.  Simply put, we cannot supplant state law to mandate *maximum* recovery for § 1983 plaintiffs.  Rather, we need to address whether the state law is inconsistent with § 1983's twin goals of deterrence and compensation.  And here, I believe that $9.6 million satisfies both of those important goals, and that we should thus respect the decision by the people of California to bar loss of life damages.

## II. We should revisit *Chaudhry*.

While I do not believe *Chaudhry* controls this case, this court should still revisit that decision in a future en banc proceeding because it misconstrued *Robertson* and relied on flawed assumptions.

First, *Chaudhry* ignored the Supreme Court's guidance about when a state law is "inconsistent" with § 1983's goals of deterrence and compensation. The opinion incorrectly suggested that if a state law denies recovery in a particular case or in *some* cases, that law conflicts with § 1983. *Chaudhry*, 751 F.3d at 1104 (rejecting California's ban on pre-death pain and suffering damages because the "practical effect" would be to "often . . . eliminate . . . damage awards for the survivors of people killed by violations of federal law").

But the Supreme Court in *Robertson* rejected such an expansive reading of the word "inconsistent." The Court upheld the Louisiana law limiting damages — even though it meant that the plaintiff in that case would receive nothing — because plaintiffs in "most" § 1983 cases would still obtain recovery. *Robertson*, 436 U.S. at 590–91. As the Court explained, if "success of the §1983 action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be the one favoring the plaintiff, and its source would be essentially irrelevant." *Robertson*, 436 U.S. at 593. Put another way, a state law is "inconsistent" with §1983's goals only if "most" §1983 plaintiffs would not obtain recovery. But *Chaudhry* turned *Robertson* on its head and implied that a state law is inconsistent whenever it denies recovery in any case or some cases.

Second, the facts in *Chaudhry* do not support its reasoning.  The court refused to apply California's law banning pre-death pain and suffering damages because following it would supposedly "eliminate . . . damage awards for the survivors of people killed by violations of federal law." *Chaudhry*, 751 F.3d at 1104.  But the facts of the case belie that assertion: "The jury awarded $700,000 to the Chaudhrys for their wrongful death claim under state law." *Id.* at 1102.  Curiously, despite briefly mentioning this fact in the background section of the opinion, the *Chaudhry* court never addressed why a wrongful death damages of $700,000 would not serve the goals of compensation and deterrence.  So contrary to *Chaudry*'s implication, California law compensated the plaintiffs, even without pre-death pain and suffering damages.  This omission strikes at the core of *Chadhry*'s reasoning for refusing to follow state law.

Finally, the opinion relied on a dubious assumption that state law limiting damages would not deter police officers and in fact may encourage them to deliberately kill suspects.  It observed that "a prohibition against pre-death pain and suffering awards for a decedent's estate has the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." *Chaudhry*, 851 F.3d at 1104.

That apparent assumption is not rooted in reality.  *See, e.g.*, *Carlson v. Green*, 446 U.S. 14, 50 n.17 (1980) (Rehnquist, J., dissenting) (rejecting the claim that law enforcement officers "would intentionally kill the individual or permit him to die, rather than violate his constitutional rights to a lesser extent, in order to avoid liability under *Bivens*").

*Chaudhry* does not provide any support for its assumption that law enforcement officers would deliberately

choose to kill, rather than injure, a suspect to avoid potential
liability for pre-death pain and suffering.  Most fatalities
involving law enforcement occur during chaotic, messy, and
dangerous situations in which officers must make split-
second decisions to protect others' lives or their own.  *See*
Jonathan Nix, "On the Challenges Associated with the Study
of Police Use of Deadly Force in the United States: A
Response to Schwartz & Jahn," (28 Jul. 2020), *PLoS One*
15(7);     e0236158     at     *3,     *available     at*
https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC7386827/
pdf/pone.0236158.pdf. (noting that "roughly 87% of the
5,134 citizens fatally shot by police officers since 2015 were
in possession of a potentially deadly weapon") (citations
omitted).   All these deaths are tragic, and many were
unwarranted in hindsight.  But no evidence even remotely
suggests that these police officers acted out of some macabre
desire to seek an "economically advantageous" outcome.

In other situations, a seemingly normal investigation or
arrest spirals out of control, leading to a tragic death.  That
is what happened here.  Acting on a woman's complaint
about a suspicious man following her, two Anaheim police
officers approached Valenzuela in a laundromat.  An officer
asked him to put his hands behind his back, but he did not
comply.  In the ensuing struggle, all three men fell to the
ground, and one of the officers put him in a neck restraint.
But Valenzuela slipped away and fled the laundromat.  One
of the officers tased him multiple times, but Valenzuela
sprinted across several lanes of traffic.  The officers caught
up to him and tried to handcuff him, but Valenzuela resisted.
During this five-minute encounter, the officers told him to
stop resisting 41 times, all to no avail.  Once the officers
finally managed to put handcuffs on Valenzuela, the officer
who had him in the neck restraint released him immediately.
Sadly, Valenzuela had lost consciousness and died eight

days later.  As I noted in our related decision, I believe that
the officers used excessive force because it was obvious that
Valenzuela was in distress.  But I do not believe they made
a calculated decision to kill him because it would be
"economically advantageous."  Indeed, once they realized
Valenzuela was unconscious, they tried to resuscitate him
through CPR.

Finally, even the most malevolent officer would not kill
a suspect because it would be "economically advantageous."
Almost all police officers today do not face any personal
financial liability because the government generally
indemnifies them.[2]  The real deterrents to police misconduct
are not monetary damages (which they do not personally pay
anyway), but firings, negative media attention, and potential
criminal liability.

Although we must construe §1983 with a broad remedial
purpose, we cannot ignore the tension between *Chaudhry*
and the actual law that Congress enacted.  If Congress really
thought that this court's job is to overwrite state law to
maximize recovery, why preserve state damages law?
*Robertson*, 436 U.S. at 593.  Surely, a uniform federal
scheme would better accomplish that goal. Instead, Congress
told us to respect states' sovereignty unless their law was
"inconsistent" with our own.  42 U.S.C. § 1988.  *Chaudhry*

---

[2] *See* Joanna C. Schwartz, "Qualified Immunity and Federalism All
the Way Down," 109 Geo. L.J. 305, 321 (2020) (discussing the
development of state indemnification practices after the Supreme Court
invented modern qualified immunity).  *See also* Martin A. Schwartz,
"Should Juries Be Informed that Municipality Will Indemnify Officers'
§ 1983 Liability for Constitutional Wrongdoing?," 86 Iowa L. Rev.
1209, 1217 (2001) (discussing the common practice of state
indemnification of officers entitled to qualified immunity).

22          VALENZUELA V. CITY OF ANAHEIM

ignores Congress' directive as well as the will of the
California people.

    I respectfully dissent.

# PLOS ONE

FORMAL COMMENT

# On the challenges associated with the study of police use of deadly force in the United States: A response to Schwartz & Jahn

**Justin Nix**◉ *

School of Criminology and Criminal Justice, University of Nebraska Omaha, Omaha, Nebraska, United States of America

* jnix@unomaha.edu

## Abstract

In response to Gabriel Schwartz and Jaquelyn Jahn's descriptive study, "Mapping fatal police violence across U.S. metropolitan areas: Overall rates and racial/ethnic inequalities, 2013–2017," I provide three reflections. First, the framing of this issue is vitally important. Second, police-involved fatalities represent a nonrandom sample of all incidents involving police use of deadly force (i.e., physical force that causes or is likely to cause death), and unfortunately, we lack comprehensive data on use of deadly force that does not result in fatalities. Finally, to make sense of who is killed by the police, researchers must also identify who was exposed to the risk of being killed by the police.



OPEN ACCESS

**Citation:** Nix J (2020) On the challenges associated with the study of police use of deadly force in the United States: A response to Schwartz & Jahn. PLoS ONE 15(7): e0236158. https://doi.org/10.1371/journal.pone.0236158

**Editor:** Jonathan Jackson, London School of Economics, UNITED KINGDOM

**Received:** March 19, 2020

**Accepted:** June 24, 2020

**Published:** July 28, 2020

**Copyright:** © 2020 Justin Nix. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Funding:** The author received no specific funding for this work.

**Competing interests:** The authors have declared that no competing interests exist.

## Introduction

Gabriel Schwartz and Jaquelyn Jahn analyzed data from Fatal Encounters—the most comprehensive database tracking police-involved deaths in the United States—and uncovered vast differences across metropolitan statistical areas (MSAs) in the overall rates of persons killed by police officers, as well as racial inequities in those rates, between 2013 and 2017 [1]. The key contribution of their analysis is that it was conducted at the MSA level, which offers a more precise look at variation in police-involved fatalities across the United States than most prior work. Four findings were especially noteworthy. First, overall rates varied extensively, from a low of 0.13 police-involved fatalities per 100,000 in Buffalo-Cheektowaga-Niagara Falls, NY to 1.17 police-involved fatalities per 100,000 in Anniston-Oxford-Jacksonville, AL. Second, western MSAs generally experienced higher annual rates of police-involved fatalities than their counterparts in the northern Midwest and Northeast. Third, across 382 MSAs, the Black incidence rate of fatalities involving police was at least 1.81 times higher than the White incidence rate (though notably, the 95% confidence intervals were wide and the vast majority included 1.00). In the Chicago-Naperville-Elgin MSA, for example, the Black incidence rate of fatalities involving police was 6.51 times (95% CI 1.84, 23.09) higher than the White incidence rate. Finally, Latinx-White inequities were less pronounced than Black-White inequities. In the Pueblo, CO MSA—which had the most extreme Latinx-White inequity from 2013 to 2017 –

PLOS ONE

the Latinx incidence rate of fatalities involving the police was 1.50 times higher than the White incidence rate.

Schwartz and Jahn performed a purely descriptive, demographic analysis. In other words, they were interested in documenting variation in police-involved fatality rates across MSAs, not attempting to explain said variation. That requires more data. As with any social phenomenon, there is value in understanding "what" before chasing answers to "why" and suggesting reforms. But as Chowkwanyun and Reed remind us, "disparity figures without explanatory context can perpetuate harmful myths and misunderstandings that actually undermine the goal of eliminating health inequities" [2]. As such, Schwartz and Jahn's study must be interpreted with three critical details in mind. First, we must consider the way we frame these discussions. Second, although Fatal Encounters offers the most comprehensive data on police use of deadly force in the United States, it likely misses hundreds, if not thousands, of police uses of deadly force each year [3]. Finally, the authors' use of census data to construct the denominator for each MSA's police-involved fatality rate rests on a strong assumption: that every person residing in each MSA is exposed to the risk of being killed by a police officer. I expand on these issues in the following discussion.

## Framing

As researchers increasingly take advantage of datasets like Fatal Encounters, it is imperative that they inspect the data to ensure they are measuring what they intend to measure [4]. Accordingly, I applaud Schwartz and Jahn for excluding from their analysis 1,670 deaths that resulted from suicides, accidents, or vehicular collisions (in a supplemental analysis, they show what the results would be with these incidents included). However, as is common practice in public health and epidemiological research, the authors framed their study as one pertaining to *fatal police violence* [5-8], which they define as "fatalities in police custody or involving the police that would not have occurred in the absence of police intervention." There is no disputing that when police kill, they do so via acts of physical violence. But labelling *every* police-involved death "fatal *police* violence" assigns all responsibility to officers, as if none of the citizens involved contributed in any way to the violence.

Criminologist Philip Stinson, an expert on police crime and integrity, defines police violence as "any amount of force…that cannot be accounted for under the auspices of lawful necessity in the line of duty" (p. 14) [9]. Following Stinson's definition, fatal police violence is an appropriate way to describe the killings of Breonna Taylor, George Floyd, Walter Scott, Philando Castile, Eric Garner, Tamir Rice, and Amadou Diallo (to name just a few). It should not be used broadly to describe what criminologists have long referred to as *police use of deadly force* [10]. Unfortunately, its usage is likely to polarize and distract from Schwartz and Jahn's important study.

Words matter. A vast literature on framing theory suggests they can have powerful effects on the way people "develop a particular conceptualization of an issue or reorient their thinking about an issue" [11; see also 12]. Recently, Fridkin et al. [13] conducted an experiment where 225 political science students viewed dashcam footage of the arrest of Ersula Ore, "an African American professor at a major southwestern university [who] was 'body slammed' to the ground…for jaywalking." Prior to watching the footage, students were randomly assigned to read brief introductory paragraphs that framed the incident in terms of *law and order* (emphasizing the jaywalking violation, the officer's concern for public safety, and the professor's "violent outburst"), *police brutality* (emphasizing the body slam and charges being pressed against the officer for excessive force), or *race* (emphasizing the race of both the officer and the professor, and mentioning a civil rights investigation). A fourth control stimulus simply informed

cited in Chenzira v. City of Avis.com
No. 2:55372 filed on 7/13/2021

PLOS ONE

students that a professor's arrest was "creating quite a stir," and directed them to watch the footage. Unsurprisingly, despite the fact that all participants viewed the same video, exposure to the *law and order* and *police brutality* frames significantly affected students' evaluations of both the officer and the professor. Framing of the event even appeared to indirectly influence their broader perceptions of racist policing being a problem in their community.

Now, consider the implications of framing all 5,494 police-involved fatalities that occurred from 2013 to 2017 as resulting from "police violence." One of the victims of "police violence" in Schwartz and Jahn's analysis is Salvador Reyes, killed on October 17, 2016 by a Tulsa (OK) police officer. This occurred following a three-hour standoff with Reyes, an estranged ex-husband who had broken into his ex-wife's home, grabbed her two-year-old daughter, and held the girl at gunpoint on a balcony. Ultimately, a police sniper shot and killed Reyes, saving the little girl's life (see S1-A of S1 Data). This was without question a *domestic violence* incident that ended with police using deadly force. Another victim of "police violence" in the sample was Micah Xavier, who ambushed Dallas (TX) police officers in July 2016, killing five and injuring nine others. Eventually, police killed Johnson with a bomb disposal robot (see S1-B of S1 Data). Though incidents like these should absolutely be documented and studied alongside other police uses of deadly force, it is debatable whether they (and many others) should be reframed as "police violence."

Indeed, much (but not all) of the time when officers use deadly force, it follows or preempts a perceived imminent deadly threat—either to their own lives or the lives of other citizens. Although the Fatal Encounters dataset does not include a field indicating whether the decedent was armed, as of March 18, 2020, *The Washington Post* reports that roughly 87% of the 5,134 citizens fatally shot by police officers since 2015 were in possession of a potentially deadly weapon (i.e., a firearm, knife/cutting instrument, or blunt object). Most who had firearms posed a direct and immediate threat to officers, according to *The Washington Post* (see S1-C of S1 Data). Given the evidence regarding framing effects, use of the term "police violence" has the potential to mislead readers who believe that police use of deadly force is rampant and usually unjustified (e.g., those who view police as "vigilantes" or "oppressors"; see [14]). It also has the potential to drive away readers who understand how statistically rare police use of deadly force is, and that it usually occurs in *response* to violence (e.g., police officers themselves, and those who view police as "professionals"; see [14] and [15–22]). I suspect *police-involved fatalities* is less leading, but this is ultimately an empirical question that future research should consider.

## Generalizing from a nonrandom sample of deadly force incidents

The foremost cause of death at the hands of police, by far, is gunshot wounds. Ninety-four percent of the deaths in Schwartz and Jahn's sample resulted from police gunfire. However, like other crowdsourced datasets tracking police use of deadly force, Fatal Encounters only documents police shootings that result in the death of a person. According to the late James Fyfe [23], a pioneer in the study of officer-involved shootings:

> The true frequency of police decisions to employ firearms as a means of deadly force. . .can best be determined by considering woundings and off-target shots as only fortuitous variations of fatal shootings. All are of a kind"

> (p. 32).

That is, each time a police officer points and shoots a firearm at a person, a deadly force incident has transpired—even if the shot(s) misses or the person survives.

PLOS ONE

In the absence of national-level data on nonfatal police shootings, we are left to estimate how often they occur. Studies conducted at lower levels of analysis (i.e., one or more agencies) suggest police shootings result in death anywhere from 15 to 50% of the time [3, 24–30]. The five years of Fatal Encounters data analyzed by Schwartz and Jahn include approximately 5,000 deaths resulting from police shootings. If we assumed that the police shooting fatality rate over this period was 50% (a liberal estimate), it would mean the authors' analysis excluded 5,000 police shootings that did not result in death (but nevertheless qualify as police uses of deadly force).

Here is why this matters: the numerators of Schwartz and Jahn's fatality rates are a *nonrandom sample* of all deadly force incidents that occurred from 2013 to 2017. To be sure, there is some degree of chance in whether a person who is shot lives or dies (e.g., whether bullets pierce a vital organ) [31–33]. But part of the variation across MSAs both in terms of rates of police-involved fatalities and racial disparities therein might be driven by nonrandom factors apart from police behavior. One such factor is trauma care accessibility. Proximity to trauma centers varies systematically across communities [34–36], and prior research indicates that shooting victims face an elevated risk of dying from their wounds when they are shot farther away from trauma-certified hospitals [37–40]. Schwartz and Jahn's analysis does not tell us the extent that police use of deadly force varies across MSAs; instead, it tells us the extent that the police-involved fatality rate varies across MSAs. This is a crucial distinction.

Any two MSAs could be remarkably similar in terms of the rate at which officers use deadly force, yet quite different in terms of the rate at which people succumb to wounds inflicted by police officers. Or vice versa. According to *VICE News*, the Las Vegas Metropolitan Police Department (LVMPD) and the St. Louis Metropolitan Police Department (SLMPD) were involved in 115 and 89 police shootings, respectively, from 2010 to 2016 [3]. That is, these two departments were involved in roughly the same number of deadly force incidents. However, LVMPD's fatality rate was 40.9% versus SLMPD's 16.8%. Thus, 47 of LVMPD's shootings were fatal, compared to just 20 of SLMPD's shootings. An analysis like Schwartz and Jahn's, conducted with these two cities, would lead to the mistaken conclusion that fatal police violence was twice as common in Las Vegas as St. Louis, despite officers in these departments using deadly force on a similar number of occasions. Meanwhile, whereas the Boston and Atlanta Police Departments were involved in 10 fatal police shootings each, Boston had just 4 additional nonfatal shootings (fatality rate = 71.4%), while Atlanta had an additional 32 (fatality rate = 23.8%) [41]. Here, an analysis like Schwartz and Jahn's would lead to the conclusion that fatal police violence occurred with the same frequency in each city, when in fact Atlanta officers were involved in 3x as many deadly force incidents. Descriptive studies limited primarily to police shootings that result in the death of a person, instead of all occasions in which officers used deadly force, can lead to mistaken inferences about racial disparities in the rate at which the police use deadly force [42].

To be clear, the lack of national data on nonfatal police shootings is a frustrating limitation with which we all must grapple. As researchers, we can either (1) abandon the study of national trends in police use of deadly force and focus on smaller units of analysis [43, 44] or (2) own the limitations of the data and be transparent about what can and cannot be concluded from analyses of them. Schwartz and Jahn's analysis cannot tell us whether officers disproportionately use deadly force against Black citizens, nor whether officers in western MSAs use deadly force at a significantly higher rate than their counterparts in northeastern MSAs. Instead, their analysis tells us that overall and race-specific fatality rates vary across MSAs. To identify the reasons for this variation, we need more data.

PLOS ONE

## The challenge of defining the at-risk population

In trying to make sense of trends and patterns in some observable police behavior, such as the use of deadly force, researchers face the difficult task of defining and measuring the counter-factual [45]. In Schwartz and Jahn's case, this would be the population of individuals who interacted with a police officer from 2013 to 2017 but were not killed. Everyone in this population was exposed to the risk, however small, of being killed by a police officer [46]. However, Schwartz and Jahn calculated their fatality rates with census data—meaning they included in their denominators millions of people who did not interact with a police officer, and whose risk of being killed by a police officer was approximately 0% (see S1-D of S1 Data). Data collected by the Bureau of Justice Statistics suggest only about 21% of the 253.6 million US residents age 16 or older had some sort of contact with a police officer in 2015 (i.e., a police officer stopped them, they were involved in traffic accident, or they called the police) [47]. Among those stopped each year, less than 2% are threatened with or subjected to police use of force [48]. One can only be subjected to police force—including deadly force—conditional on inter-acting with a police officer in time and space. So how informative is it to calculate police-involved fatality rates for a population that is mostly never at risk?

The authors defend their methodological decision as follows:

> We use population denominators to align with, and allow comparisons to, previous demo-graphic work in this area, and because using race-specific crime or arrest counts—themselves shaped by racial bias and segregation—yields estimates of a different and potentially biased contrast than the rather simple ones we answer here. . .

The authors are correct in their assertion that race-specific crime or arrest benchmarks are flawed. Meta-analytic studies have documented clear racial disparities in arrests [49], and fur-thermore, the available data demonstrate that deadly force incidents do not occur exclusively during the investigation of criminal activity or in the course of making arrests [45]. In other words, being killed by a police officer is not conditional on committing a crime or being arrested.

The authors continue:

> . . .in which metropolitan areas are people most likely to be killed by police, what is the differ-ence in these rates by race, and how does this vary across MSAs?

Answering these questions requires knowing how many people in each MSA *were not killed by police*. Knowing how many were not killed arguably requires determining who was *at risk* of being killed. A Venn diagram of the "at risk" and general populations would not perfectly align—instead, the "at risk" circle would be a small circle within the much larger general popu-lation circle. Perhaps some comparisons to other phenomena are in order. To estimate mater-nal mortality rates, researchers do not include all women in the denominator, but instead the number of live births [50]. To estimate meaningfully the rate at which sexually transmitted dis-eases proliferate, researchers would want to identify the sexually active population [51]. Finally, to estimate the rate at which sharks bite people, researchers would need to determine who goes into the water [52]. Studies concerned with police use of deadly force must be equally attentive to identifying a *meaningful* denominator.

My stance is that by calculating police-involved fatality rates with police-citizen interactions in the denominator, we can at least be certain that everyone in the sample we are analyzing was exposed to some risk of being subjected to deadly force. This is no easy task, as reliable

cited in valenzuela v. City of Anaheim No. 20-55372 archived July 28, 2021

PLOS ONE

data on the rate at which police officers interact with people are not systematically collected. The Police-Public Contact Survey is administered in three-year intervals, and provides only a national-level snapshot, which precludes investigating the substantial variation that occurs at smaller units of analysis, as Schwartz and Jahn did. Further complicating matters, being stopped by police officers may be a mediator on the causal pathway between race and police use of deadly force, and the available evidence indicates that both crime reporting [53–55] and proactive police stops [56–59] differ systematically across racial groups. As such, conditioning on stops could bias analyses by (1) blocking a mediating path and (2) inducing collider stratification bias [58, 60]. Is the solution to ignore this mediator—which is literally a necessary precondition for being killed by a police officer—and calculate rates for the entire population (most of whom are never at risk)? If the goal is to understand and improve officer decision-making as a way to save lives, then I am not convinced. Stopping a person and using deadly force on a person are two different decision points, with different antecedents, and need to be analyzed as such.

To be clear, there is nothing inherently wrong about Schwartz and Jahn's use of population denominators in their analysis, so long as readers bear in mind there are *many* factors (including police behavior) that drive the disparities [53–67]. I am merely pointing out that it produces rates that are not all that helpful in understanding *why* police-involved fatalities vary across space as they do. But again, in fairness, the authors made no attempt to explain the underlying reasons for said variation. Future research must do so.

## Where to go from here?

I believe a lot can be gleaned from Schwartz and Jahn's article, and agree that "place-specific policy contexts are likely a major cause of the distribution of overall incidence rates." The authors specifically mention state and local firearm regulations, levels of segregation and policy drivers of those levels, or differences in police training and police department protocols." Daniel Nagin, for example, uncovered a "correlation between statewide prevalence of gun ownership and fatal police shootings for both all decedents and unarmed decedents," and confirmed that "greater access to trauma centers is associated with lower rates of citizen deaths" [68]. In a separate study, Jay Jennings and Meghan Rubado showed that agencies requiring officers to file a report when they point their firearms at people experience significantly lower rates of fatal police shootings [69]. In short, reducing police-involved fatalities requires a multi-faceted approach.

From the police perspective, it will require reducing the frequency with which officers are forced to make "split-second decisions." In part, this means getting officers to slow down and reduce their sense of urgency [70]. As Lawrence Sherman [71] notes:

> [C]onventional viewpoint places the policy for when to shoot in the context of the split second when an officer pulls the trigger—thereby ignoring all the contextual factors that shape (and limit) the choices of any officer who arrives at that split-second, final frame. Viewing a police encounter as a movie, we can rewind the movie to identify many previous "frames" in the reel of film, in which a different choice may have saved everyone from harm

(p. 11).

Improved decision making in the earlier "frames" of police-citizen interactions might be achieved via training [72–74] and policy [75, 76], but Philip Atiba Goff and Hilary Rau argue that agencies would get more return on investment if they focused on how they screen applicants [77]. There are, of course, more drastic measures that could be taken. In the wake of the

cited in var City of Anaheim
No. 20-55 archived July 29, 2021

PLOS ONE

recent police killings of Breonna Taylor and George Floyd (and ongoing protests across the world), there is currently a push to defund local police departments and rethink their function in US society [78–82]. As communities explore these and other ways to reduce police-involved fatalities, it is imperative that they set clear and manageable goals, define at the onset what they would consider *success* or *failure*, and rigorously evaluate the effects of the policies or interventions implemented.

As important, our understanding of police use of deadly force continues to be hindered by a lack of comprehensive, national data. Fortunately, some states have begun collecting more comprehensive use of force data from their respective local agencies (see "Police Involved Deaths and Use of Force" at https://www.ncsl.org/research/civil-and-criminal-justice/law-enforcement.aspx#3). Andrew Wheeler and colleagues recently proposed that the Federal Bureau of Investigation (FBI) add fields to its National Incident-Based Reporting System (NIBRS) [44]. Specifically, agencies could provide information about officer-involved shootings (fatal and nonfatal) as well as less-lethal forms of force, including weapon draws, Taser uses, and empty-hand tactics. This would allow researchers to analyze use of force incidents alongside those that do not result in force [83], and would make for more informative comparisons of trends across time and space. The FBI plans to transition fully to NIBRS by 2021, so participation by state and local agencies should increase significantly in the coming years. The transition could be a golden opportunity to collect better data.

Improved data will enhance researchers' ability to describe *how* use of deadly force varies across jurisdictions, as well as to explore the viable reasons *why* it varies the way it does. Ultimately, the answers to these questions will help us identify plausible ways to save lives.

## Supporting information

**S1 Data.**
(DOCX)

## Author Contributions

**Conceptualization:** Justin Nix.

**Writing – original draft:** Justin Nix.

**Writing – review & editing:** Justin Nix.

## References

1. Schwartz GL, Jahn JL. Mapping fatal police violence across U.S. metropolitan areas: Overall rates and racial/ethnic inequities, 2013–2017. PLoS ONE. 2020.

2. Chowkwanyun M, Reed AL. Racial health disparities and Covid-19—Caution and context. New England Journal of Medicine. 2020; 0. https://doi.org/10.1056/NEJMp2012910 PMID: 32374952

3. McCann A, Hamilton K, Dolven T, Caulderwood K, Arthur R. Police shoot far more people than anyone realized, a VICE News investigation reveals. In: Vice [Internet]. 12 Dec 2017 [cited 17 Mar 2020]. https://www.vice.com/en_ca/article/xwvv3a/shot-by-cops

4. Nix J, Lozada MJ. Do police killings of unarmed persons really have spillover effects? Reanalyzing Bor et al. (2018). SocArXiv; 2020 Jan.

5. DeVylder JE, Jun H-J, Fedina L, Coleman D, Anglin D, Cogburn C, et al. Association of Exposure to Police Violence With Prevalence of Mental Health Symptoms Among Urban Residents in the United States. JAMA Netw Open. 2018; 1: e184945–e184945. https://doi.org/10.1001/jamanetworkopen.2018.4945 PMID: 30646377

6. Fedina L, Backes BL, Jun H-J, Shah R, Nam B, Link BG, et al. Police violence among women in four U. S. cities. Preventive Medicine. 2018; 106: 150–156. https://doi.org/10.1016/j.ypmed.2017.10.037 PMID: 29104021

cited in Valenzuela v. City of Anaheim, No. 20-55372 archived on July 28, 2021

7. Krieger N, Chen JT, Waterman PD, Kiang MV, Feldman J. Police Killings and Police Deaths Are Public Health Data and Can Be Counted. PLoS Med. 2015; 12. https://doi.org/10.1371/journal.pmed.1001915 PMID: 26645383

8. Premkumar A, Nseyo O, Jackson AV. Connecting Police Violence with Reproductive Health. Obstetrics & Gynecology. 2017; 129: 153–156. https://doi.org/10.1097/AOG.0000000000001731 PMID: 27926648

9. Stinson PM Sr. Criminology Explains Police Violence. 2020;  Univ. of California Press.

10. Fyfe JJ. Police use of deadly force: Research and reform. Just Q. 1988; 5: 165–206.

11. Chong D, Druckman JN. Framing theory. Annual Review of Political Science. 2007; 10: 103–126. https://doi.org/10.1146/annurev.polisci.10.072805.103054

12. Tversky A, Kahneman D. The framing of decisions and the psychology of choice. Science. 1981; 211: 453–458. https://doi.org/10.1126/science.7455683 PMID: 7455683

13. Fridkin K. Race and police brutality: The importance of media framing. International Journal of Communication. 2017; 11: 3394–3414.

14. Hirschfield PJ, Simon D. Legitimating police violence: Newspaper narratives of deadly force. Theoretical Criminology. 2010; 14: 155–182. https://doi.org/10.1177/1362480609351545

15. Fyfe JJ. Toward a typology of police shootings. In JJ Fyfe (Ed.), Contemporary Issues in Law Enforcement. 1981; 136–151. Sage.

16. Binder A, Fridell L. Lethal force as a police response. Criminal Justice Abstracts. 1984; 16: 250–280.

17. Binder A, Scharf P. The violent police-citizen encounter. The ANNALS of the American Academy of Political and Social Science. 1980;  452: 111–121. https://doi.org/10.1177/000271628045200111

18. Geller WA, Karales KJ. Shootings of and by Chicago Police: Uncommon Crises—Part I: Shootings by Chicago Police. J Crim L & Criminology. 1981; 72: 1813–1866.

19. Koper CS. Advancing research and accountability on police use of deadly force micro-ecology of deadly force: editorial introduction. Criminology & Public Policy. 2016; 15: 187–192.

20. Selby N, Singleton B, MS EF, Bruce C, Mulvey A. In Context: Understanding Police Killings of Unarmed Civilians. Harley A, editor.  CIAI Press. 2016.

21. Stoughton S, Noble V, Alpert G. Evaluating Police Uses of Force. NYU Press; 2020.

22. White MD. Transactional encounters, crisis-driven reform, and the potential for a national police deadly force database. Criminology & Public Policy. 2016; 15: 223–235. https://doi.org/10.1111/1745-9133.12180

23. Fyfe JJ. Shots fired: An examination of New York City police firearms discharges. Dissertation, State University of New York at Albany. 1978.

24. Fyfe JJ. Geographic Correlates of Police Shooting: A microanalysis. Journal of Research in Crime and Delinquency. 1980; 17: 101–113.

25. Meyer MW. Police shootings at minorities: The case of Los Angeles. The Annals of the American Academy of Political and Social Science. 1980; 452: 98–110.

26. White MD. Hitting the target (or not): Comparing characteristics of fatal, injurious, and noninjurious police shootings. Police Quarterly. 2006; 9: 303–330. https://doi.org/10.1177/1098611105277199

27. Klinger DA. On the problems and promise of research on lethal police violence: A research note. Homicide Studies. 2012; 16: 78–96. https://doi.org/10.1177/1088767911430861

28. Klinger D, Rosenfeld R, Isom D, Deckard M. Race, crime, and the micro-ecology of deadly force. Criminology & Public Policy. 2016; 15: 193–222. https://doi.org/10.1111/1745-9133.12174

29. Ura A. Little Concrete Data Underpins Police Shooting Debates in Texas | Unholstered. In: The Texas Tribune [Internet]. 30 Aug 2016 [cited 17 Mar 2020]. https://apps.texastribune.org/unholstered/records/

30. Montgomery B, Humburg C. Why cops shoot. 2017 [cited 17 Mar 2020]. http://www.tampabay.com/projects/2017/investigations/florida-police-shootings/why-cops-shoot

31. Zimring FE. The medium is the message: Firearm caliber as a determinant of death from assault. The Journal of Legal Studies. 1972; 1: 97–123.

32. Cook PJ, Braga AA, Turchan BS, Barao LM. Why do gun murders have a higher clearance rate than gunshot assaults? Criminology & Public Policy. 2019; 18: 525–551. https://doi.org/10.1111/1745-9133.12451

33. Braga AA, Cook PJ. The association of firearm caliber with likelihood of death from gunshot injury in criminal assaults. JAMA Netw Open. 2018; 1: e180833–e180833. https://doi.org/10.1001/jamanetworkopen.2018.0833 PMID: 30646040

cited in Urtuela v. City of Anaheim
No. 20-55772 archived July 28, 2021

34. Branas CC, MacKenzie EJ, Williams JC, Schwab CW, Teter HM, Flanigan MC, et al. Access to trauma centers in the United States. JAMA. 2005; 293: 2626–2633. https://doi.org/10.1001/jama.293.21.2626 PMID: 15928284

35. Wandling M, Behrens J, Hsia R, Crandall M. Geographic disparities in access to urban trauma care: Defining the problem and identifying a solution for gunshot wound victims in Chicago. The American Journal of Surgery. 2016; 212: 587–591. https://doi.org/10.1016/j.amjsurg.2016.06.020 PMID: 27567114

36. Hanke PJ, Gundlach JH. Damned on arrival: A preliminary study of the relationship between homicide, emergency medical care, and race. Journal of Criminal Justice. 1995; 23: 313–323. https://doi.org/10.1016/0047-2352(95)00022-I

37. MacKenzie EJ, Jurkovich GJ, Frey KP, Scharfstein DO. A national evaluation of the effect of trauma-center care on mortality. N Engl J Med. 2006;  13.

38. Circo G, Wheeler AP. Network distance and fatal outcomes among gunshot wound victims. SocArXiv; 2019 Aug.

39. Crandall M, Sharp D, Unger E, Straus D, Brasel K, Hsia R, et al. Trauma deserts: distance from a trauma center, transport times, and mortality from gunshot wounds in Chicago. Am J Public Health. 2013; 103: 1103–1109. https://doi.org/10.2105/AJPH.2013.301223 PMID: 23597339

40. Circo GM. Distance to trauma centres among gunshot wound victims: identifying trauma 'deserts' and 'oases' in Detroit. Injury Prevention. 2019; 25: i39–i43. https://doi.org/10.1136/injuryprev-2019-043180 PMID: 31160372

41. Nix J. The problems with OIS data that only capture fatalities. 23 Jun 2019 [cited 8 Jun 2020]. https://jnix.netlify.app/post/post2-fatality-rates/

42. Nix J, Alpert GP. Crowdsourced police shooting data: What we know and what we're missing. Paper presented at the 114th Annual Meeting of the American Sociological Association. New York, NY; 2019. https://jnix.netlify.app/files/asa19_slides.pdf

43. Shjarback JA. State-mandated transparency: A discussion and examination of deadly force data among law enforcement agencies in Texas. Journal of Crime and Justice. 2019; 42: 3–17. https://doi.org/10.1080/0735648X.2018.1547353

44. Wheeler AP, Phillips SW, Worrall JL, Bishopp SA. What factors influence an officer's decision to shoot? The promise and limitations of using public data. Justice Research and Policy. 2017; 18: 48–76.

45. Tregle B, Nix J, Alpert GP. Disparity does not mean bias: Making sense of observed racial disparities in fatal officer-involved shootings with multiple benchmarks. Journal of Crime and Justice. 2019; 42: 18–31.

46. Clark TS, Cohen E, Gunderson A, Glynn A, Owens ML, Schiff KJ. Are police racially biased in the decision to shoot? 2020. https://static1.squarespace.com/static/58d3d264893fc0bdd12db507/t/5e6bf2f51861a32988365242/1584132858096/Racial_Bias_in_Shootings.pdf

47. Davis E, Langton L. Contacts Between Police and the Public, 2015. Washington, DC: Bureau of Justice Statistics; 2018. Report No.: NCJ 251145. https://www.bjs.gov/content/pub/pdf/cpp15.pdf

48. Hyland S, Langton L, Davis E. Police Use of Nonfatal Force, 2002–11. Washington, DC: Bureau of Justice Statistics; 2015. Report No.: NCJ 249216. https://www.bjs.gov/content/pub/pdf/punf0211.pdf

49. Kochel TR, Wilson DB, Mastrofski SD. Effect of suspect race on officers' arrest decisions. Criminology. 2011; 49: 473–512. https://doi.org/10.1111/j.1745-9125.2011.00230.x

50. Creanga AA, Syverson C, Seed K, Callaghan WM. Pregnancy-related mortality in the United States, 2011–2013. Obstet Gynecol. 2017; 130: 366–373. https://doi.org/10.1097/AOG.0000000000002114 PMID: 28697109

51. Kost K, Forrest JD. American women's sexual behavior and exposure to risk of sexually transmitted diseases. Family Planning Perspectives. 1992; 24: 244–254. https://doi.org/10.2307/2135853 PMID: 1483527

52. McPhee D. Unprovoked shark bites: Are they becoming more prevalent? Coastal Management. 2014; 42: 478–492. https://doi.org/10.1080/08920753.2014.942046

53. Engel RS, Smith MR, Cullen FT. Race, place, and drug enforcement: Reconsidering the impact of citizen complaints and crime rates on drug arrests. Criminology & Pub Policy. 2012; 11: 603–636.

54. Takei C. How Police Can Stop Being Weaponized by Bias-Motivated 911 Calls. In: American Civil Liberties Union [Internet]. 18 Jun 2018 [cited 9 Jun 2020]. https://www.aclu.org/blog/racial-justice/race-and-criminal-justice/how-police-can-stop-being-weaponized-bias-motivated

55. Xie M, Lauritsen JL. Racial context and crime reporting: A test of Black's Stratification Hypothesis. J Quant Criminol. 2012; 28: 265–293. https://doi.org/10.1007/s10940-011-9140-z

cited in — Fairy v. City of Anaheim
No. 20-55372 archived on July 28, 2021

56. Epp CR, Maynard-Moody S, Haider-Markel DP. Pulled over: How police stops define race and citizenship. University of Chicago Press; 2014.

57. Gelman A, Fagan J, Kiss A. An analysis of the New York City Police Department's "Stop-and-Frisk" policy in the context of claims of racial bias. Journal of the American Statistical Association. 2007; 102: 813–823. https://doi.org/10.1198/016214506000001040

58. Knox D, Lowe W, Mummolo J. Administrative records mask racially biased policing. SSRN Electron J. 2019. https://doi.org/10.2139/ssrn.3336338

59. Pierson E, Simoiu C, Overgoor J, Corbett-Davies S, Jenson D, Shoemaker A, et al. A large-scale analysis of racial disparities in police stops across the United States. Nature Human Behaviour. 2020; 1–10.

60. Ross CT, Winterhalder B, McElreath R. Resolution of apparent paradoxes in the race-specific frequency of use-of-force by police. Palgrave Commun. 2018; 4. https://doi.org/10.1057/s41599-018-0110-z

61. Bursik RJ, Grasmick HG. Neighborhoods and crime: The dimensions of effective community control. Macmillan; 1993.

62. Krivo LJ, Peterson RD. Extremely disadvantaged neighborhoods and urban crime. Social Forces. 1996; 75: 619–648.

63. McNamarah CT. White Caller Crime: Racialized Police Communication and Existing While Black. Michigan Journal of Race & Law. 2019; 24: 335–416.

64. McNulty TL. Assessing the race-violence relationship at the macro level: The assumption of racial invariance and the problem of restricted distributions. Criminology. 2001; 39: 467–490.

65. Peterson RD, Krivo LJ. Divergent social worlds: Neighborhood crime and the racial-spatial divide. Russell Sage Foundation; 2010.

66. Sampson RJ. Great American city: Chicago and the enduring neighborhood effect. University of Chicago Press; 2012.

67. Sampson RJ, Lauritsen JL. Racial and ethnic disparities in crime and criminal justice in the United States. Crime and Justice. 1997; 21: 311–374. https://doi.org/10.1086/449253

68. Nagin DS. Firearm availability and fatal police shootings. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 49–57. https://doi.org/10.1177/0002716219896259

69. Jennings JT, Rubado ME. Preventing the use of deadly force: The relationship between police agency policies and rates of officer-involved gun deaths. Public Administration Review. 2017; 77: 217–226. https://doi.org/10.1111/puar.12738

70. Klinger D. Organizational accidents and deadly police-involved violence: Some thoughts on extending theory, expanding research, and improving police practice. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 28–48. https://doi.org/10.1177/0002716219892913

71. Sherman LW. Evidence-based policing and fatal police shootings: Promise, problems, and prospects. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 8–26. https://doi.org/10.1177/0002716220902073

72. McLean K, Wolfe SE, Rojek J, Alpert GP, Smith MR. A randomized controlled trial of social interaction police training. Criminology and Public Policy. 2020; forthcoming. https://www.researchgate.net/publication/341976823_A_Randomized_Controlled_Trial_of_Social_Interaction_Police_Training

73. Wolfe S, Rojek J, McLean K, Alpert G. Social interaction training to reduce police use of force. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 124–145. https://doi.org/10.1177/0002716219887366

74. Wood G, Tyler TR, Papachristos AV. Procedural justice training reduces police use of force and complaints against officers. PNAS. 2020; 117: 9815–9821. https://doi.org/10.1073/pnas.1920671117 PMID: 32312803

75. Zimring FE. When Police Kill. Harvard University Press; 2017.

76. Zimring FE. Police killings as a problem of governance. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 114–123. https://doi.org/10.1177/0002716219888627

77. Goff PA, Rau H. Predicting bad policing: Theorizing burdensome and racially disparate policing through the lenses of social psychology and routine activities. The ANNALS of the American Academy of Political and Social Science. 2020; 687: 67–88. https://doi.org/10.1177/0002716220901349

78. Brewster J. LA Mayor Slashes LAPD Budget As Calls To 'Defund Police' Slowly Pick Up Steam. In: Forbes [Internet]. [cited 8 Jun 2020]. https://www.forbes.com/sites/jackbrewster/2020/06/04/la-mayor-slashes-lapd-budget-as-calls-to-defund-police-slowly-pick-up-steam/

79. Meares TL, Tyler TR. The First Step Is Figuring Out What Police Are For. The Atlantic. 8 Jun 2020. https://www.theatlantic.com/ideas/archive/2020/06/first-step-figuring-out-what-police-are/612793/. Accessed 8 Jun 2020.

80. Rosenburg T. The simple idea that could transform US criminal justice. In: The Guardian [Internet]. 23 Jun 2015 [cited 8 Jun 2020]. http://www.theguardian.com/us-news/2015/jun/23/procedural-justice-transform-us-criminal-courts

81. Solender A. Minneapolis To Disband Police Department. In: Forbes [Internet]. [cited 8 Jun 2020]. https://www.forbes.com/sites/andrewsolender/2020/06/07/minneapolis-votes-to-disband-police-department/

82. Vitale AS. The End of Policing.  Verso Books; 2017.

83. Nix J, Richards TN, Pinchevsky GM, Wright EM. Are domestic incidents really more dangerous to police? Findings from the 2016 National Incident Based Reporting System. Justice Quarterly. 2019; 0: 1–23. https://doi.org/10.1080/07418825.2019.1675748

cited in Valenzuela v. City of Anaheim No. 20-55372 archived on July 28, 2021

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶ A material point of fact or law was overlooked in the decision;
  - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ►      Consideration by the full Court is necessary to secure or maintain
> uniformity of the Court's decisions; or
>
> ►      The proceeding involves a question of exceptional importance; or
>
> ►      The opinion directly conflicts with an existing opinion by another
> court of appeals or the Supreme Court and substantially affects a
> rule of national application in which there is an overriding need for
> national uniformity.

**(2)   Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of
  judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case,
  the time for filing a petition for rehearing is 45 days after entry of judgment.
  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be
  accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the
  due date).
- An order to publish a previously unpublished memorandum disposition
  extends the time to file a petition for rehearing to 14 days after the date of
  the order of publication or, in all civil cases in which the United States or an
  agency or officer thereof is a party, 45 days after the date of the order of
  publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's
  judgment, one or more of the situations described in the "purpose" section
  above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the
  alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being
  challenged.
- An answer, when ordered by the Court, shall comply with the same length
  limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a
  petition for panel rehearing or for rehearing en banc need not comply with
  Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                     **Date**

*(use "*s/[typed name]*" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*